THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| **JOHN ALEXANDER** | § | |
| **ZAPATA HINCAPIE,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 5:23-cv-00045** |
| | § | |
| | § | |
| **TEXAS TECH UNIVERSITY,** | § | |
| **Dr. Sindee Lou Simon,** | § | |
| **Dr. Albert Sacco, Jr.,** | § | |
| **Dr. Mark A. Sheridan,** | § | |
| **Dr. Brandon Weeks,** | § | |
| **Dr. Gerardine Gabriela Botte,** | § | |
| **Dr. Chau-Chyun Chen,** | § | |
| **Dr. Siva Vanapalli,** | § | |
| **Dr. Wei Li,** | § | |
| **Dr. Harvinder Singh Gill,** | § | |
| | § | |
| **Defendants.** | § | **JURY DEMANDED** |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

## I.     INTRODUCTION

1.      Plaintiff John Alexander Zapata Hincapie ("Mr. Zapata")1 brings this action for

injunctive relief, damages, attorneys' fees, and court costs against Defendants Texas Tech University, Dr.

Sindee Lou Simon, Dr. Albert Sacco, Jr., Dr. Mark A. Sheridan, Dr. Brandon Weeks, Dr. Gerardine

Gabriela Botte, Dr. Chau-Chyun Chen, Dr. Siva Vanapalli, Dr. Wei Li, and Dr. Harvinder Singh Gill

(collectively, "Defendants") under Title VI of the Civil Rights Act of 1965, and under 42 U.S.C. § 1981,

as well as the Equal Protection and Due Process clauses of the Fourteenth Amendment of the United

States Constitution, through 42 U.S.C. § 1983.

---

1 During the time period relevant to this complaint, Mr. Zapata was awarded his PhD by
Defendant Texas Tech University.  Consequently, he is now Dr. Zapata Hincapie.  For the sake
of consistency and clarity, however, Plaintiff uses the appellation "Mr. Zapata" throughout this
pleading.

2.      As discussed further below, Dr. Sindee Lou Simon, Mr. Zapata's dissertation advisor during his time as a PhD student at Texas Tech and throughout the period of time relevant to this litigation, created a hostile educational environment for Mr. Zapata based entirely on his Hispanic ethnicity and his country of national origin--Colombia.  She yelled at him constantly without provocation and for no apparent reason.  She harassed him when he spoke his native language in circumstances in which she did not criticize Asians for doing the same.  She cut off Mr. Zapata's PhD funding while all his Asian group members continued to receive PhD funding.  She enforced degree requirements against Mr. Zapata that were not enforced against his Asian peers in his department.  She failed to comply with other requirements herself, such as providing Mr. Zapata an opportunity to take his qualifying exam within two years of matriculation.  She changed her positions constantly and endlessly with regard to the tasks Mr. Zapata would have to perform to meet her shifting criteria and to obtain his PhD degree.  Ultimately, she delayed his graduation from Texas Tech University in every way possible until Mr. Zapata lost his job, his health insurance, and a great deal more besides, as well as compromising his mental health.  In these and in many other ways, Dr. Simon discriminated against Plaintiff on the basis of his race and national origin and in favor of his Asian peers.

3.      Texas Tech University and the other Defendants in this matter both endorsed and facilitated Dr. Simon's behavior even after her departure from Texas Tech University.  Without this endorsement and facilitation, Dr. Simon's discriminatory actions and omissions could not have had their full impact on Mr. Zapata.

4.      Plaintiff has suffered extensive damages as a result of Defendants' misconduct.

5.      Plaintiff sought relief from every agency of Texas Tech that he could.  These agencies dismissed Plaintiff's concerns, thus enabling Dr. Simon to continue her misconduct.  As a result, Plaintiff has had no alternative but to seek the intervention of this Court.  As discussed below, he seeks both injunctive relief and damages.

## II.    JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action and may grant the relief sought herein pursuant to 28 U.S.C. § 1331 by virtue of claims brought pursuant to 42 U.S.C. § 1983 and other federal statutes.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

7.    Venue is proper under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims alleged herein occurred in this district in or around Lubbock, Texas, located in Lubbock County.

## III.    PARTIES

8.    Plaintiff John Alexander Zapata Hincapie is a Colombian citizen who is currently a resident of the state of Wisconsin.  Mr. Zapata resided in Lubbock, Texas, during a substantial portion of the time period relevant to his claims and during a time period in which the majority of his causes of action arose.  During a substantial portion of the relevant time period, Mr. Zapata was a student at Texas Tech University and/or an employee of Texas Tech University.

9.    Defendant Texas Tech University ("Texas Tech") is a public institution of Higher Learning and organized within the State of Texas.  It may be served with process by service upon its Vice Chancellor and General Counsel, Eric D. Bentley, at System Administration Building 1508 Knoxville Ave., Ste. 301, Lubbock, Texas 79409.  At all times relevant to this cause, Texas Tech University was a public university located in Lubbock County, Texas, which seeks and receives federal financial assistance from the Federal Government for its educational programs and activities.

10.    Defendant Dr. Sindee Lou Simon ("Dr. Simon") is an individual who was employed by Defendant Texas Tech as a full-time faculty member in the Chemical Engineering

Department from 1999 until the end of the Spring 2021 semester and was a Texas resident residing in Lubbock County during the same period.  On information and belief, Defendant Dr. Simon is a current resident of North Carolina since at least June 2021 and is a full-time faculty member at North Carolina State University ("NC State").  Defendant Dr. Simon is sued in her individual capacity.  She may be served at the Department of Chemical and Biomolecular Engineering, NC State University, Centennial Campus, 911 Partners Way, Engineering Building 1, Room 2-009, Raleigh, North Carolina 27695-7905.

11.    Defendant Dr. Albert Sacco Jr. ("Dr. Sacco") is an individual who was employed by Defendant Texas Tech as the Dean of the Edward E. Whitacre Jr. College of Engineering during the relevant time periods.  Dr. Sacco served in his position as Dean from January 1, 2011, to approximately August 16, 2022.  On information and belief, Dr. Sacco is still a resident of Lubbock, Texas.  Defendant Dr. Sacco is sued in his individual capacity.

12.    Defendant Dr. Mark A. Sheridan ("Dr. Sheridan") is an individual who is employed by Defendant Texas Tech as Dean of the Graduate School and is also the Vice Provost for Graduate and Postdoctoral affairs.  Dr. Sheridan is a resident of Lubbock, Texas.  Defendant Dr. Sheridan is sued in his official capacity for certain claims for relief and in his individual capacity for certain claims for relief as set forth below.  Dr. Sheridan may be served with process by service upon Texas Tech Vice Chancellor and General Counsel, Eric D. Bentley, at System Administration Building, 1508 Knoxville Ave., Ste. 301, Lubbock, Texas 79409.  At all times relevant to this matter, Dr. Sheridan was employed, contractually and/or otherwise, and/or acting as an agent of Texas Tech University.

13.    Defendant Dr. Brandon Weeks ("Dr. Weeks") is an individual who is employed by Defendant Texas Tech as Professor and who was the Dean of Research and Graduate

Programs during the relevant times of Mr. Zapata's claims. Dr. Weeks is a resident of Lubbock, Texas. Dr. Weeks is sued in his official capacity for certain claims for relief and in his individual capacity for certain claims for relief as set forth below. Dr. Weeks may be served with process by service upon Texas Tech Vice Chancellor and General Counsel, Eric D. Bentley, at System Administration Building, 1508 Knoxville Ave., Ste. 301, Lubbock, Texas 79409. At all times relevant to this matter, Dr. Weeks was employed, contractually and/or otherwise, and/or acting as an agent of Texas Tech.

14.     Defendant Dr. Gerardine Gabriela Botte ("Dr. Botte") is an individual who is employed by Defendant Texas Tech as Professor and who held the position as chair of the Department of the Chemical Engineering from 2019 to approximately September 2022. Dr. Botte is a resident of Lubbock, Texas. Dr. Botte is sued in her official capacity for certain claims for relief and in her individual capacity for certain claims for relief as set forth below. Dr. Botte may be served with process by service upon Texas Tech Vice Chancellor and General Counsel, Eric D. Bentley, at System Administration Building, 1508 Knoxville Ave., Ste. 301, Lubbock, Texas 79409. At all times relevant to this matter, Dr. Botte was employed, contractually and/or otherwise, and/or acting as an agent of Texas Tech.

15.     Defendant Dr. Chau-Chyun Chen ("Dr. Chen") is an individual who is employed by Defendant Texas Tech as Professor and Graduate Advisor of the Department of Chemical Engineering. Dr. Chen is a resident of Lubbock, Texas. Dr. Chen was a member of the Chemical Engineering Graduate Committee during Fall 2021, part of the relevant period of Mr. Zapata's claims. Dr. Chen is sued in his official capacity for certain claims for relief and in his individual capacity for certain claims for relief as set forth below. Dr. Chen may be served with process by service upon Texas Tech Vice Chancellor and General Counsel, Eric D. Bentley, at

System Administration Building, 1508 Knoxville Ave., Ste. 301, Lubbock, Texas 79409.  At all times relevant to this cause, Dr. Chen was employed, contractually and/or otherwise, and/or acting as an agent of Texas Tech University.

16.     Defendant Dr. Siva Vanapalli ("Dr. Vanapalli") is an individual who is employed by Defendant Texas Tech as Professor of the Department of Chemical Engineering.  Dr. Vanapalli is a resident of Lubbock, Texas.  Dr. Vanapalli was a member of the Chemical Engineering Graduate Committee during Fall 2021, part of the relevant period of Mr. Zapata's claims.  Dr. Vanapalli is sued in his official capacity for certain claims for relief and in his individual capacity for certain claims for relief as set forth below.  Dr. Vanapalli may be served with process by service upon Texas Tech Vice Chancellor and General Counsel, Eric D. Bentley, at System Administration Building, 1508 Knoxville Ave., Ste. 301, Lubbock, Texas 79409.  At all times relevant to this cause, Dr. Vanapalli was employed, contractually and/or otherwise, and/or acting as an agent of Texas Tech University.

17.     Defendant Dr. Wei Li ("Dr. Li") is an individual who is employed by Defendant Texas Tech as Associate Professor of the Department of Chemical Engineering.  Dr. Li is a resident of Lubbock, Texas.  Dr. Li was a member of the Chemical Engineering Graduate Committee during Fall 2021, part of the relevant period of Mr. Zapata's claims, and also a member of Mr. Zapata's doctoral dissertation committee.  Dr. Li is sued in his official capacity for certain claims for relief and in his individual capacity for certain claims for relief as set forth below.  Dr. Li may be served with process by service upon Texas Tech Vice Chancellor and General Counsel, Eric D. Bentley, at System Administration Building, 1508 Knoxville Ave., Ste. 301, Lubbock, Texas 79409.  At all times relevant to this cause, Dr. Li was employed, contractually and/or otherwise, and/or acting as an agent of Texas Tech University.

18.     Defendant Dr. Harvinder Singh Gill ("Dr. Gill") is an individual who is employed by Defendant Texas Tech as Professor of the Department of Chemical Engineering.  Dr. Gill is a resident of Lubbock, Texas.  Dr. Gill was a member of the Chemical Engineering Graduate Committee during Fall 2021, part of the relevant period of Mr. Zapata's claims.  Dr. Gill is sued in his official capacity for certain claims for relief and in his individual capacity for certain claims for relief as set forth below.  Dr. Gill may be served with process by service upon Texas Tech Vice Chancellor and General Counsel, Eric D. Bentley, at System Administration Building 1508, Knoxville Ave., Ste. 301, Lubbock, Texas 79409.  At all times relevant to this cause, Dr. Gill was employed, contractually and/or otherwise, and/or acting as an agent of Texas Tech University.

## IV.     FACTS

19.     Mr. Zapata was a Hispanic doctoral student at the Chemical Engineering Department (the "Department") at Texas Tech from the Fall 2016 to the Fall 2021.  Texas Tech is a public university located in Lubbock, Texas, and receives federal financial assistance.

20.     Mr. Zapata is an immigrant to the United States, having moved to the United States from Medellin, Colombia, in 2013.  Mr. Zapata came to the United States on a scholarship to the University of Oklahoma.  Prior to receiving his Master's degree in Chemical Engineering from the University of Oklahoma in 2016, Mr. Zapata completed his undergraduate degree in Colombia.

21.     Mr. Zapata became a PhD student in the Department within the Edward E. Whitacre Jr. College of Engineering at Texas Tech (the "College of Engineering") in the Fall 2016 semester and continued in the doctoral program within the Department until December 10, 2021, graduating with a 3.92 grade point average.

22.     Mr. Zapata did more than merely study in the Department.  He represented Texas

Tech in several national and international chess tournaments and was hired as an instructor for

the Department starting in the Fall 2021 semester, contracted for two years and with funds

approved to work until Fall 2025.

23.     During Mr. Zapata's time in the Department he won several awards, including a

$500 award as the Best Teaching Assistant in the Department (Spring 2017), a $1,000 award for

the North American Thermal Analysis Society best student paper (August 2019), a $250 travel

award for the Annual Technical Conference for Plastic Engineers (Spring 2020), a $500

scholarship award from the Graduate Student Society of Plastic Engineers (Spring 2021), and

$1,000 per semester throughout his entire PhD program in Texas Tech chess scholarships.

24.     Despite all of Mr. Zapata's contributions to Texas Tech, his PhD advisor and

dissertation chair, Dr. Sindee Lou Simon, exhibited disparate and discriminatory behaviors

towards him for several years motivated by and targeting Mr. Zapata's race (Hispanic) and

national origin (Colombia).  The PhD students in the Department are predominantly Asian

students from Asian countries of origin.  Similarly, during the time frame of Mr. Zapata's PhD

study at least 50% of the faculty of the Department was composed of Asian professors, originally

from Asian countries.  Dr. Simon discriminated in favor of these Asian students and against Mr.

Zapata and other Hispanics.  As recounted below, Texas Tech and the other individual

Defendants in this matter facilitated and exacerbated Dr. Simon's behaviors in this regard.

25.     Dr. Simon's discriminatory conduct led to severely damaging consequences

when, in the Spring of 2021, Mr. Zapata sought to defend his doctoral dissertation and to

graduate with other similarly situated Asian PhD students in the Department.  Dr. Simon did

everything in her power to impede Mr. Zapata from graduating during the Spring of 2021: she

cut his PhD funding, which forced him to work as a teaching assistant, she delayed the timing of his qualifying exam in comparison to his group members, and she failed to provide him with a specific time frame to defend his PhD prior to the Spring 2021 deadline.  Dr. Simon's other four advisees during the Spring 2021 semester were all Asian from Asian countries of origin.  By on or about April 21, 2021, Mr. Zapata had completed exactly the same PhD degree requirements as the other four advisees in all other respects.

26.     In May 2021, but after the Spring 2021 graduation deadline, Mr. Zapata successfully defended his doctoral dissertation and Dr. Simon and all the rest of dissertation committee members signed his oral defense and thesis-dissertation approval form, indicating that both his written dissertation and his oral presentation were successful.  However, Dr. Simon compounded the damage she had already done by requiring Mr. Zapata to make a series of untimely revisions to his written dissertation, two weeks prior to the Summer 2021 commencement, after Dr. Simon had already left Texas Tech to work as a full-time employee at North Carolina State University ("NC State").  On information and belief, Dr. Simon engaged in no such conduct with respect to any of Mr. Zapata's Asian peers.  As discussed in greater detail below, Dr. Simon's conduct was consistent with her history of discriminatory treatment, regardless of the severe consequences of that treatment.  As also discussed in greater detail below, Texas Tech and the other individual defendants paved the way for Dr. Simon to carry on her discriminatory actions to their full effect.  These wrongful actions inflicted substantial injury on Mr. Zapata and his career.

## A.     Dr. Simon's General Treatment of Mr. Zapata and Other Hispanics

27.     Dr. Simon became Mr. Zapata's academic and research advisor during his first semester at Texas Tech.  Dr. Simon was a well-known scholar in the area of polymer science and

the kinetics of glasses, a Horn Professor—the university's highest faculty designation—and the chair of the Department during the period of 2012-2019. Very early on after Dr. Simon became Mr. Zapata's advisor, he began experiencing discriminatory treatment at her hands.

28.     As an initial matter, Mr. Zapata was subjected to disparate discriminatory treatment by Dr. Simon, who yelled at him on too many occasions to count over the course of several years. Dr. Simon would not hesitate to yell at Mr. Zapata at any and all times and in any and all settings, as she would yell at him in her office, in the Department lobby in front of people, and even in conference settings with other attendees watching. She created a hostile environment for him through her constant harassment. Because of this incessant verbal abuse, the scariest and most traumatizing moments over the course of Mr. Zapata's multi-year effort to complete his doctoral program were his weekly meetings with Dr. Simon. Mr. Zapata felt powerless given Dr. Simon's role as the Department chair for the majority of his PhD studies, as his advisor, and as the provider of Mr. Zapata's PhD funding.

29.     Dr. Simon never offered any reasonable grounds for her behavior, plausible or otherwise. For example, in August 2018, Dr. Simon yelled at Mr. Zapata in the Department lobby and in front of others when she saw him speaking with other Hispanic friends. After the incident, when Mr. Zapata requested to discuss any concerns Dr. Simon had about him in private and not in front of others, Dr. Simon ignored Mr. Zapata's concerns of mistreatment and instead tried to justify yelling at him in front of friends and colleagues by alleging that "every time" Dr. Simon saw Mr. Zapata he was with his friends, leaving her with the "impression that that is all [Mr. Zapata was] doing."

30.     On information and belief, Dr. Simon did not yell at any of the Asian PhD students in the Department in public. On information and belief, the Asian PhD students in the

Department spent as much or more time in the company of others as did Mr. Zapata.  On information and belief, Mr. Zapata did not engage in any behavior (1) towards which yelling was an appropriate response, (2) materially different from behavior engaged in by other PhD students in the Department, or (3) that could reasonably have been perceived as provocative in any way.

31.     Dr. Simon also asked Mr. Zapata not to speak Spanish and to practice a supposed "English only rule" despite Texas Tech proclaiming itself a Hispanic-serving institution.  With this practice also Dr. Simon treated Mr. Zapata in a very discriminatory manner compared to her Asian advisees.  Dr. Simon instructed Mr. Zapata not to speak Spanish early on during his doctoral program and repeatedly throughout the course of that program.  Likewise, other Hispanic students in the Department have described to Mr. Zapata several instances of Dr. Simon's discriminatory behavior towards them when speaking Spanish, up to and including telling a group of Hispanic PhD students in the Department not to speak in Spanish among themselves even in private conversations while walking around the Department.  Her conduct was materially different towards the Asian PhD students in the Department.

32.     Dr. Simon exhibited hostile discriminatory behavior towards Mr. Zapata in other ways on other occasions as well.  For example, early on in his PhD career, Mr. Zapata and another Asian student, who belonged to the research group of Dr. Simon's husband, Dr. Gregory McKenna, were placed in a collaborative research project with industrial collaborators.  As part of the research proposal, the industrial collaborators agreed to host the graduate students working on the proposal to do internships for extended periods (6-12 months) at their laboratories so that the students could gain real-life experience.  Despite the industrial collaborators' contractual agreement to host both students, only the Asian student was selected to have the offered internship.  Dr. Simon denied Mr. Zapata's repeated requests for this same opportunity.

33.     As yet another example, despite having published earlier than most members of his cohort, Mr. Zapata was and still is the only student in that cohort whose publications are not shown in Dr. Simon's research websites at Texas Tech or NC State during the relevant periods listed in the websites or on the Department's website under "Journal Articles" during the relevant periods.

34.     Furthermore, Mr. Zapata was the only student who graduated from his PhD program at the Department who was listed on Dr. Simon's current NC State research website as "current graduate student" for several months after his PhD graduation, despite Dr. Simon's knowledge of his graduation in Fall 2021.  Moreover, unlike with her other graduate students, Dr. Simon does not list any of Mr. Zapata's publications on her public profile on her NC State website.  No reasonable explanation exists for this disparity between Dr. Simon's treatment of Mr. Zapata and others similarly situated.  Taken together with her other wrongful conduct, this disparity can best be explained as arising from Dr. Simon's discriminatory attitude towards Mr. Zapata and other Hispanics.

**B.     Dr. Simon's Conduct in the Spring 2021 Semester**

35.     On or about January 2021, Dr. Simon told her group of advisees that she was leaving Texas Tech to work at another university and that the entire group—consisting of five people, including Mr. Zapata—needed to graduate by May 2021, as she was leaving the university by the end of the semester.

36.     Although Mr. Zapata had no complaint about Dr. Simon's timeline, it did present considerable challenges.  Besides having to edit and defend his doctoral dissertation by the end of the Spring 2021 semester like all four of his Asian lab mates, Mr. Zapata also would have to take the qualifying exam during the fifth year of his PhD, a daunting task even in the best of

circumstances.  Dr. Simon had total control over the timeframe of the qualifying exam.  Mr. Zapata was the only person in the group of five set to graduate in May 2021 who had not previously been allowed to take the qualifying exams, despite his previous requests to Dr. Simon to give him the qualifying exams in a timely manner.

37.     As stipulated in the Department's student handbook, the qualifying exam consists of an independent four-to-six week research project, different from the current research projects. According to the student handbook, a student's advisor should assign the qualifying exam within the first two years of matriculation into the program.  After the four-to-six week period, the student provides a written report and an oral presentation defending the research work to a committee composed of four experts, including the student's advisor.  When the student successfully passes the qualifying exam, the student is advanced to PhD candidacy.

38.     Having repeatedly failed to assign Mr. Zapata a qualifying exam in timely fashion and according to the Department's policies, Dr. Simon now placed Mr. Zapata in a situation in which he was effectively forced to take that exam only shortly before his dissertation defense so that Mr. Zapata could graduate prior to Dr. Simon's departure from Texas Tech.  Given the very uncommon circumstance of having a student defend a qualifying exam and a doctoral dissertation in the same semester, Dr. Simon requested a special permission for this purpose from the Dean of the Graduate School, Dr. Mark A. Sheridan.  Dr. Sheridan granted this special permission on or about February 18, 2021.

39.     During this highly rushed timeframe, Dr. Simon also violated the Department's policies regarding the selection of dissertation committee members.  The Department's handbook states that students are permitted to select their dissertation committee members.  However, Mr. Zapata was not allowed to select the members of his dissertation committee.  In fact, Dr. Simon

did not even consult with him at all when selecting his committee members, one of which was her husband.  Dr. Simon selected as members of Mr. Zapata's doctoral committee herself, Dr. Gregory McKenna (her husband), Dr. Wei Li (a member of the Department), and Dr. Edward Quitevis (an outside member from the Chemistry department).  On information and belief, Dr. Simon did not treat her Asian advisees in this manner.  In addition, by getting his committee members assigned in the same semester of his intended graduation and so late in his doctoral program, Mr. Zapata was deprived of the possibility of meeting annually with them to report research progress and to receive feedback, in contradiction to the Department's handbook rules.

40.    On or about January 22, 2021, Mr. Zapata received notification from the Department assigning him to a teaching assistant ("TA") position for the fourth time during his PhD program.  Mr. Zapata could make no sense of this assignment because, as stated in the Department's handbook, graduate students were only required to be a TA three times, unless the advisor did not have sufficient funding, in which case, as outlined by the Graduate School guidelines, the advisor was supposed "not [to] withdraw monetary support without reason and due notice."

41.    Mr. Zapata discovered later that Dr. Simon, without discussing it with him or sending him a notification of any kind, had cut his PhD funding, thus forcing the TA assignment upon him in the midst of his defense of his qualifying exam and of his dissertation.  Mr. Zapata was the only student of Dr. Simon's five PhD students that semester—all of whom were Asian, except for Mr. Zapata—for whom Dr. Simon cut funding for the entire Spring 2021.  Even though the only requisite for graduation of any of his Asian peers was to write and to defend their doctoral dissertation – a fraction of what Mr. Zapata had to do during the same semester – Dr. Simon chose Mr. Zapata, and only Mr. Zapata, from whom to withdraw monetary support

14

during the Spring 2021 semester.  Mr. Zapata has not met or even heard of any other graduate student in the Department before or since having to perform TA duties, to defend a qualifying exam, and to defend a dissertation in the same semester.

42.     On or about February 5, 2021, Mr. Zapata defended his qualifying exam to all his committee members.  Mr. Zapata was congratulated on his performance by every committee member, including by Dr. Simon herself.  None of the committee members, including Dr. Simon, notified Mr. Zapata that he did not successfully pass the qualifying exam or even gave him any hint that such a result might be a possibility.

43.     Soon after defending his qualifying exam, Mr. Zapata sent an email to Dr. Simon requesting her availability for him to defend his doctoral dissertation prior to the Spring 2021 graduation deadline (April 2, 2021).  Dr. Simon had already set a time and date to attend the doctoral defense for all his Asian peers.  However, Dr. Simon did not provide Mr. Zapata a time to defend his dissertation prior to the Spring 2021 deadline like all his Asian peers.  Instead, Dr. Simon inexplicably told Mr. Zapata that she wanted him now to graduate in the Summer 2021 semester and to defend his doctoral dissertation after the Spring 2021 graduation deadline.  As a result, Mr. Zapata was forced to void his intent to graduate for the Spring 2021 semester and became the only member of Dr. Simon's group of five advisees, all of whom had the same number of publications and similar credentials in all other relevant respects, who was never given a timeframe to defend his dissertation prior to the Spring 2021 graduation deadline and who thus could not graduate in Spring 2021.

44.     Dr. Simon set Mr. Zapata's doctoral defense for May 13, 2021, prior to her departure from Texas Tech for her new full-time employment at NC State, and a little over a month after the Spring 2021 graduation deadline for doctoral defenses (April 2, 2021).

45.     On or about March 5, 2021, Dr. Simon signed her approval to the Optional

Practical Training ("OPT") form that is given to the International Affairs office of Texas Tech to

initiate the process to change Mr. Zapata's status from an F1 Visa student to a legal worker in the

United States.  This approval constitutes a statement that, to the best of the advisor's knowledge,

the student will graduate during the semester indicated on the form.  Dr. Simon marked the form

in such a manner as to indicate that the projected completion date of Mr. Zapata's academic

program was August 2021.  Based on this representation, the OPT process was initiated.

46.     On or about March 22, 2021, more than a month after defending his qualifying

exam, Mr. Zapata was contacted by the Graduate School because they still had not received the

"qualifying exam report," which is the official form, signed by the student's advisor, that notifies

the Graduate School that the student passed the qualifying exam.  That same day, Dr. Simon

informed Mr. Zapata for the first time, despite having had several prior meetings with him since

his defense of the qualifying exam, that she did not consider him to have passed the qualifying

exam.  Instead, she told Mr. Zapata that to "pass" the qualifying exam he should perform more

experiments and correct "errors and misinterpretations in the written part of the exam."  Mr.

Zapata had never been told by Dr. Simon, or by any of his committee members, that more

experiments were needed or that his written report needed any type of correction for him to

"pass" the qualifying exam.  On the contrary, as explained above, each member of the committee

had congratulated him on his performance and never expressed any need for more experiments

or corrections.

47.     According to the Department's handbook, the only three possible outcomes of the

qualifying exam are pass, re-defend, or fail.  Dr. Simon's insistence that Mr. Zapata perform

more experiments and make various corrections placed him impermissibly outside any of these

three categories.  Since Mr. Zapata was never told that he had to re-defend, and certainly not that

he was unsuccessful, he firmly believed until on or about March 22, 2021, that he had

successfully passed the qualifying exam.  Mr. Zapata now had even less time to fulfill all his

graduation requirements, which depended almost entirely on Dr. Simon who was set to leave

Texas Tech by the end of the Spring 2021 semester.

48.     After Dr. Simon expressed her new and untimely expectations for his qualifying

exam, Mr. Zapata followed a routine of going day and night to the laboratory, constantly sending

experimental updates to Dr. Simon, until she finally agreed to sign his qualifying exam report on

or about April 21, 2021.  This left Mr. Zapata with a short time period for him to focus on

writing and defending his doctoral defense, scheduled approximately 22 days away on May 13,

2021.

49.     Around this time, Mr. Zapata's mental health was deteriorating due to the

intentional hostile actions of Dr. Simon.  As a result, Mr. Zapata sought, for the first time in his

life, psychological counseling by attending weekly therapy sessions from about April 5, 2021,

until the end of 2021.  Likewise, due to the constant amount of pressure by Dr. Simon, Mr.

Zapata had to go to Urgent Care on May 1, 2021, twelve days prior to his doctoral defense, as

one of the veins on his finger started swelling because of stress.  With just approximately twelve

days before his scheduled doctoral defense, with a swollen finger, and sleep-deprived, Mr.

Zapata had to keep working and preparing his doctoral dissertation defense to compensate for

becoming sick with a very tight upcoming deadline.

50.     Around this time, because Mr. Zapata's girlfriend was offered a job as a tenure

track assistant professor at Texas Tech, Mr. Zapata himself was also offered a spousal

accommodation and an instructor position at the Department.  The spousal accommodation was

provided by the Dean of the College of Engineering, Dr. Sacco, thus ensuring that Mr. Zapata and his girlfriend were both going to be faculty members at Texas Tech, would be able to live in the same city, and would be able to start a life together, after approximately three years in a long-distance relationship.

51.     Moreover, the fact that Dr. Simon was no longer a faculty member during the Summer 2021, that Mr. Zapata's girlfriend was going to be a faculty member during the Summer 2021 semester, and that he was also now scheduled to graduate during the Summer 2021 semester created an unexpected possibility: as graduate faculty member Mr. Zapata's girlfriend could now be his hooding professor during his Summer 2021 graduation ceremony.  Given the very rare occurrence, of a girlfriend having the possibility to hood her boyfriend, Mr. Zapata decided that this was the perfect occasion for him to propose to his girlfriend at the moment when she was hooding him.  To make sure that his girlfriend was going to be allowed to be his hooding professor, Mr. Zapata requested a permission which was granted by the Dean of the Graduate School, Dr. Mark Sheridan, on July 14, 2021.  The participation of his girlfriend and the proposal prospect made the Summer 2021 graduation ceremony even more special for Mr. Zapata.

**C.     Defendants' Conduct in the Summer and Fall 2021 Semesters**

52.     On or about May 13, 2021, Mr. Zapata successfully passed his doctoral thesis.  In the official approval form his graduation date was set to be Summer 2021.  As stated in the official approval form, signing the form was a recognition that the student gave a successful oral presentation and that the student's written dissertation met with the committee approval.  Dr. Simon and all of Mr. Zapata's committee members signed the approval form after Mr. Zapata defended his doctoral dissertation.

53.     On or about May 13, 2021, Dr. Simon also sent an email to Mr. Zapata, apparently a few minutes after signing the official approval form, stating: "I want to make sure that you do understand that your dissertation does NOT meet my approval yet."  Despite signing a form entitled "ORAL DEFENSE and THESIS-DISSERTATION APPROVAL FORM" which is the formal mechanism by which a dissertation chair and committee members indicate in writing the approval of a doctoral candidate's written dissertation and oral defense, Dr. Simon quickly sent Mr. Zapata an email telling him that the form did not actually mean what it said.  No other committee member expressed any need for dissertation changes before or after Mr. Zapata's defense or imposed on him such a condition.  Since no faculty member, including Dr. Simon, told him that he would not graduate in Summer 2021, Mr. Zapata expected that he would still graduate in the Summer 2021 semester.

54.     During the Summer 2021 semester, given that he had no PhD funding or job due to Dr. Simon's actions, Mr. Zapata requested multiple times to be given a TA position within the Department.  Mr. Zapata's request was denied, leaving him with no PhD funding during the Summer of 2021 semester and eventually also during the Fall 2021 semester.

55.     On or about June 25, 2021, and well before the July 5, 2021, deadline to do so, Mr. Zapata submitted the final version of his dissertation via the electronic theses and dissertations ("ETD") system.  The ETD is the official Texas Tech platform where dissertations are submitted and revised for "grammar and punctuation, formatting and style, and approval of advisor or dissertation chair."  The Graduate School approved Mr. Zapata's dissertation for any grammar, punctuation, formatting, or style issues by July 21, 2021.

56.     Multiple emails were automatically generated by the ETD system and sent to Dr. Simon between on or about June 25, 2021, to on or about July 22, 2021, to remind Dr. Simon to

comment about Mr. Zapata's dissertation and to indicate whether it met with her approval. However, Mr. Zapata received no comments on the official ETD system, despite the fact that Dr. Simon had access to the ETD system throughout this time period.  Another member of Mr. Zapata's cohort told him that Dr. Simon used the ETD system to communicate dissertation corrections to this person and other members of Dr. Simon's research group, and yet she ignored Mr. Zapata's dissertation entirely.  In addition to failing to approve his dissertation, Dr. Simon failed to grade the research credit hour that Mr. Zapata had to take during the Summer 2021 semester, despite Mr. Zapata asking multiple times to receive a grade.

57.     As it was evident to Mr. Zapata at this point that Dr. Simon was intentionally not performing the final steps for his graduation after she left Texas Tech, Mr. Zapata contacted the Graduate School multiple times in an effort to remedy the matter.  Mr. Zapata was told not to worry by the Graduate School and that a "Dean" was going to step in and assume Dr. Simon's role as his dissertation approver if Dr. Simon did not take action close to his graduation.  On or about July 22, 2021—over two months after Dr. Simon approved Mr. Zapata's doctoral dissertation in writing on the official university form—Dr. Brandon Weeks, Dean of Research and Graduate Programs, was assigned to be Mr. Zapata's dissertation approver, even though Dr. Wei Li, one of Mr. Zapata's doctoral committee members who had read his dissertation, was a faculty member of the Department.

58.     On or about July 22, 2021, presumably spurred by the appointment of Dr. Weeks, Dr. Simon sent an email to Mr. Zapata, copying Dr. Weeks and Dr. Sheridan, effectively stating that Dr. Simon still wanted him to do a "final" list of corrections to his dissertation.  Dr. Simon sent this email two weeks prior to Mr. Zapata's PhD Summer commencement, almost one month after he submitted his dissertation, and at a moment in which Dr. Simon was a full-time faculty

member at another university.

59.     After Mr. Zapata replied to Dr. Simon, indicating that he was surprised to receive what were mostly new revisions to his dissertation this late in the process and asking her to reconsider the list of revisions so that he could graduate, Dr. Simon responded on or about July 23, 2021, by eliminating a few revisions, indicating that not all the revisions she sent on July 22, 2021, were critical to Mr. Zapata's final dissertation, but still requiring him to address revisions to his dissertation, just two weeks prior to his PhD graduation.

60.     The list of untimely revisions that Dr. Simon was requesting in her July 22 and July 23 emails was not only unfairly scheduled but not realistic in light of Mr. Zapata's previously scheduled commitments and the time frame of his summer graduation, which Dr. Simon knew was a mere two weeks away.  Once again, Dr. Simon continued her discriminatory actions by intentionally stunting Mr. Zapata's ability to graduate for a second time.  She had never displayed such conduct in connection with any of Mr. Zapata's Asian peers.

61.     From on or about July 22, 2021, forward, almost every email communication Mr. Zapata would have with Dr. Simon was also copied to: 1) the Dean of the Graduate School, Dr. Mark Sheridan, 2) the Associate Dean of Research and Graduate Programs, Dr. Brandon Weeks, and in several instances, to: 3) the Chair of the Department, Dr. Gerardine Botte, 4) the Department's Graduate Advisor, Dr. Chau-Chyun Chen, 5) a member of the Department's Graduate Committee, Dr. Siva Vanapalli, and others.

62.     On or about July 26, 2021, Mr. Zapata received an email from Dr. Sheridan, officially notifying him that he would no longer be able to graduate in August 2021.  The decision taken by Dr. Sheridan not to allow Mr. Zapata to graduate during the Summer 2021 was taken based on Dr. Simon's July 23 email, referenced above, and did not offer Mr. Zapata any

possibility to address or challenge Dr. Simon's untimely "final corrections" in the time left until his graduation.  Dr. Sheridan's email stated that to complete his PhD degree requirements Mr. Zapata needed to: 1) have his dissertation approved by Dr. Simon in accordance with her July 23 email and 2) satisfy the "two publications" requirement of the College of Engineering—a "requirement" which was not imposed on any of the four Asian students in Dr. Simon's group who graduated in Spring 2021.  In the same July 26, 2021, email, Dr. Sheridan also informed Mr. Zapata that he must be enrolled in at least one research credit hour until he met both the above-mentioned criteria, thus forcing him to continue paying money to Texas Tech while the requirements for his graduation constantly shifted.

63.     In light of Dr. Sheridan's July 26 email, Mr. Zapata requested to Dr. Sheridan, to the Department (through Dr. Botte), to the Associate Dean of Research and Graduate Programs (Dr. Weeks), and to the Senior Vice-Provost (Dr. Robert Stewart) on different occasions either to replace his advisor or to allow him to have another committee Chair and to leave Dr. Simon as co-advisor.  These individuals and entities never granted Mr. Zapata's request, despite the fact that he made them aware of Dr. Simon's discriminatory treatment of him for years.

64.     These denials themselves suggest discriminatory motives.  After all, two Chinese PhD students who had Dr. Simon's husband as their research advisor were assigned a full-time co-advisor during the Fall 2021 semester, after his departure with his wife for full-time employment at NC State.  Dr. Simon's husband was also in the Department and had an area of research similar to that of his wife.  In fact, the new advisor for the two Chinese PhD students was a member of Mr. Zapata's own doctoral committee, Dr. Wei Li, a professor also from China. The Department did not assign Dr. Li or any other new advisor to Mr. Zapata to replace Dr. Simon, despite Mr. Zapata's repeated requests.  Mr. Zapata even contacted Dr. Li to ask him to

serve as his new advisor or to approve his dissertation in the ETD system, but his requests were denied, despite Dr. Li signing his "ORAL DEFENSE and THESIS-DISSERTATION APPROVAL FORM" and never expressing or suggesting a need for dissertation changes.  At least two other Asian students within the Department have been assigned new advisors when their advisors left the university.  Likewise, university policies indicate that, when an advisor leaves the Department, he or she is no longer able to act as a Committee Chair.  Nevertheless, Mr. Zapata continued to receive less favorable treatment compared to his Asian peers.  Dr. Simon remained his Committee Chair until his graduation in December 2021.

65.     On July 30, 2021, Mr. Zapata and his girlfriend flew to Florida, where she lived at that time, to start the moving process from Florida to their new unfurnished apartment in Lubbock, Texas.  Mr. Zapata had not slept for days, working on Dr. Simon's untimely correction requests, and he was under unprecedented levels of stress.  Despite Dr. Sheridan's decision on July 26, 2021, not to allow him to graduate in August, Mr. Zapata was still determined to try to finish every correction prior to his commencement ceremony on August 7, 2021, even under sleep deprivation and with previous commitments, based on the small chance that Dr. Simon or the Graduate School would reconsider allowing him to graduate and thereby reopen the possibility of him proposing to his girlfriend during the Summer 2021 commencement.

66.     So overwhelmed was Mr. Zapata with stress and lack of sleep at this point, however, that, upon his arrival in Florida, he recognized the physical impossibility of his driving back to Texas.  As Mr. Zapata's girlfriend did not have a driver's license, they were forced to cancel the U-Haul vehicle they had previously booked, to give all their furniture away, and to reserve a last-minute flight back to Texas for the next day.  They lost everything that was unable to fit in their bags.

67.     On or about August 2, 2021, when Mr. Zapata and his girlfriend finally arrived in Lubbock, they came back to an empty apartment.  They had to sleep on the floor.  They not only had to purchase emergency flights to go back to Texas, to rent a car, and to pay for a hotel room and for gas, but they also had to spend money furnishing their empty apartment at a time when Mr. Zapata was not receiving a salary, all because of Dr. Simon's untimely dissertation "corrections" and Dr. Sheridan's decision to permit them, despite the fact that these actions and omissions violated Texas Tech's own policies.

68.     On August 4, 2021, Mr. Zapata sent his finalized dissertation to Dr. Simon.  Mr. Zapata submitted all the requested changes to his dissertation prior to the summer graduation date of August 7.  In the same August 4, 2021, email, Mr. Zapata also requested to receive credit for the research course he was taking during the Summer 2021 semester.  After receiving no response from Dr. Simon and no course credit despite an August 9, 2021, deadline to enter grades, Mr. Zapata followed up with Dr. Simon on August 11, 2021.  Dr. Simon responded on August 11, 2021, stating that she would "look at it early next week."

69.     On or about August 18, 2021, Mr. Zapata started his full-time instructor position for Texas Tech, which was contracted for two years, with funds approved to work until Fall 2025, and for teaching three different courses.

70.     After receiving no response or further comments on his dissertation, Mr. Zapata followed up once again with Dr. Simon on August 20, 2021.  Dr. Simon responded that she would "try" to read the dissertation the following weekend, as she was too busy with "other issues" related to her full-time position at NC State.

71.     On August 23, 2021, after almost three weeks of not addressing Mr. Zapata's dissertation corrections, Dr. Simon responded to him with several brand-new corrections to make

to his Introduction (Chapter 2).  Dr. Simon also requested an Excel file with data related to Chapter 4 and stated that she "will fit the data for him" and that she was going to send Mr. Zapata specific corrections to Chapter 4, along with details on how to fit the data.

72.     Despite Dr. Simon having clearly moved the bar once again when she had stated in her July 22 and 23 emails that the revisions she was putting forward then would be the final edits to the dissertation, Mr. Zapata nonetheless made the requested corrections and sent Dr. Simon an email with the updated dissertation the following day, along with the requested Excel file – which he had already sent to Dr. Simon previously on or about July 28, 2021.

73.     On or about August 27, 2021, Dr. Sheridan emailed Mr. Zapata in response to Mr. Zapata's request for clarification on the stopping point for these shifting corrections to his dissertation, stating: "So, the answer to your question is: the process will end when you have fully, completely, and accurate[ly] addressed the points raised by Dr. Simon in her 8/23/2021 email message."  With this communication, Dr. Sheridan indicated his refusal to consider the discriminatory and otherwise arbitrary nature of Dr. Simon's approach and his willingness to endorse any approach Dr. Simon might adopt going forward.

74.     Left with no other choice, Mr. Zapata worked to address the new set of "corrections."  In an August 24, 2021, email, Mr. Zapata once again asked Dr. Simon for an important clarification regarding how she wanted him to model data related to Chapter 4 of the dissertation—an issue which Dr. Simon would leave unaddressed for about 59 days until on or about October 20, 2021.

75.     On or about August 29, 2021, Mr. Zapata sent an email to Dr. Simon inquiring if Chapter 5 and other chapters met her approval criteria.  Dr. Simon responded on August 30, 2021, with numerous brand-new corrections of Chapter 5 that were never discussed in previous

emails.  These new Chapter 5 changes came more than a month after the July 22 - 23 "final" list of Dr. Simon's revisions and after her multiple subsequent demands for additional revisions.  By requiring changes to Chapter 5 and otherwise ignoring Mr. Zapata's question, Dr. Simon implied that the remaining chapters were satisfactory.

76.    On or about August 31, 2021, Mr. Zapata followed up with an email to Dr. Simon, in light of the fact that she had still not acknowledged the previous corrections of Chapter 5 that Mr. Zapata had sent to her in his August 4 email.  On or about September 1, 2021, Dr. Simon replied by incorrectly stating that in her July 23 email she had required him to add error bars to his Chapter 5 data and that the lack of such error bars constituted the main issue with Chapter 5.  In fact, although Dr. Simon's July 22 email had contained an instruction regarding error bars, she had expressly removed this instruction from the requirements listed in her July 23 email, indicating as noted above that not all the revisions she had sent on July 22, 2021, were critical to Mr. Zapata's final dissertation.  Dr. Simon in her July communications unequivocally demonstrated that she did not think that the error bars issue was the main issue with Chapter 5. Once again, Dr. Simon made clear that her intention was not to require legitimate corrections, but rather to insist on Mr. Zapata aiming at and hitting a forever moving target.

77.    Consistent with her past practice, on or about September 13, 2021, Dr. Simon sent Mr. Zapata numerous brand-new "corrections" for Chapter 4 that were, once again, beyond what was requested in her July 23 email or any previous emails.

78.    On or about September 21, 2021, Mr. Zapata received an email from Dr. Sheridan checking in on the status of his dissertation.  Mr. Zapata replied and expressed his concerns regarding the ongoing process, including his concerns about Dr. Simon's repeated requests for new and never discussed corrections, about her failure to provide him feedback for the

corrections he had made, about the inconsistencies in requested "corrections," about the obstacles posed by the general approach towards him adopted by Dr. Simon, about the inequity of allowing Dr. Simon to continue as committee chair when she was no longer employed by Texas Tech, and about that Dr. Simon allowed other students to graduate with only one publication.  Dr. Sheridan neither acknowledged nor addressed the majority of Mr. Zapata's concerns. Instead, he merely asked Mr. Zapata to make a "best faith effort" to address the remaining issues of the ongoing iterative process with no end in sight and with no explanation as to what a "best faith effort" might entail in the face of Dr. Simon's ongoing discriminatory approach.  Further communications with Dr. Sheridan brought nothing more substantive, but only hostility and condescension.  Dr. Sheridan did mention that he was going to convene a committee if Mr. Zapata's revisions of Chapters 4 and Chapter 5 did not bring closure to the process. However, no committee was ever convened.

79.     On or about September 24, 2021, after a few more exchanges in which Mr. Zapata repeatedly asked if Chapter 5 was approved, Dr. Simon finally stated that Chapter 5 was "ok," thus indicating her approval.  The approval of Chapter 5 was also acknowledged by Dr. Sheridan on September 27, 2021.  The approval of Chapter 5 was also confirmed by Dr. Weeks, who on October 20, 2021—almost a month after Dr. Simon approved Chapter 5—stated in a meeting with Mr. Zapata: "Chapter 5 is done…As far as I am concerned it is done.  I have seen the email. I will defend you on that."  Nevertheless, just two days after Dr. Weeks made the above comments, Dr. Simon sent further "corrections" of the previously approved Chapter 5.  Despite their previous assertions, both Dr. Sheridan and Dr. Weeks failed to intervene on Mr. Zapata's behalf and, in fact, gave continued free reign to Dr. Simon to disapprove an already approved Chapter and/or to change the requirements or her position on the dissertation as often and as

27

arbitrarily as she chose.

80.     On or about September 26, 2021, Mr. Zapata sent an email to Dr. Sheridan because he still had questions about the "two publications" requirement, which by this point rested solely in the hands of Dr. Simon.  Dr. Sheridan replied that he could not provide guidance on this "requirement" and instructed Mr. Zapata to direct his energy towards completing his dissertation.  The Dean of the College of Engineering, Dr. Albert Sacco Jr., was also copied on this email, and told Mr. Zapata on September 27, 2021, that he needed to "…to get that 2nd paper out ASAP…if this is not the case, please let me know for in[sic] has an impact on my agreement to help with your spousal accommodation."  Mr. Zapata reasonably construed Dr. Sacco's words as an unmistakable threat to his spousal accommodation and his instructor position in the Department.

81.     On or about September 28, 2021, Mr. Zapata retained an attorney to help him initiate a formal grievance process pursuant to Texas Tech policies, due to the possibility of losing his job as a result of his complaints about Dr. Simon's behavior and the unequal treatment of the "two publications" policy, the ever-expanding list of dissertation "corrections" sent by Dr. Simon, and Texas Tech's refusal to help him resolve this matter.  The grievance letter was officially filed on October 14, 2021, with Dr. Sheridan, who left the grievance unaddressed.  No committee was ever convened to address Mr. Zapata's grievance letter.  No formal decision regarding his grievance letter was ever communicated to Mr. Zapata, as required by Texas Tech's own policies.

82.     On or about October 3, 2021, Mr. Zapata sent an email addressing all the proposed "corrections" of Chapter 4, except one based on a crucial Excel file that Dr. Simon had committed to send Mr. Zapata since August 23, 2021.  In this October 3 email, Mr. Zapata asked

both for feedback on his dissertation corrections and for an update on the status of the work of Dr. Luigi Grassia—a prospective co-author of Mr. Zapata's intended second publication—to whom Mr. Zapata had sent all the necessary data to do his part since July 28, 2021, and whose work was important for submitting a publication from Chapter 4 of Mr. Zapata's dissertation.

83.     True to her now evident pattern of constantly altering the landscape without legitimate justification or purpose, it was not until October 14, 2021, that Dr. Simon sent an email regarding Chapter 4, in the form, once again, of a numerous list of brand-new dissertation "corrections", several of which depended on the Excel file Mr. Zapata was told he would receive since August 23, 2021, and the vast majority of which were unrelated to any other previous requests.

84.     After still further back and forth communications between Mr. Zapata and Dr. Simon in October 2021, in which Mr. Zapata would send corrections and Dr. Simon would respond with new "issues" requiring "correction" even in chapters long ago approved and in which Dr. Simon would ignore Mr. Zapata's request for an update on the status of the publication process, it became clear that Dr. Simon had turned the dissertation into a veritable hydra where, for every one "correction" Mr. Zapata made, she would "discover" multiple other issues that would require "correcting."  Mr. Zapata at this point, in an effort to preserve a chance of graduation even in the Fall 2021 semester, had to resign his full-time job to dedicate himself fully to these "corrections" and the required second publication.  If Mr. Zapata did not graduate in the Fall 2021 semester, he would jeopardize his ability to extend his one-year OPT for two more years, as the doctoral degree was required to submit an OPT extension.  The stress continued to mount.

85.     Mr. Zapata resigned his full-time instructor position from the Department on

October 25, 2021, effective November 8, 2021, giving two-weeks' notice. Resigning from his job was a very difficult decision, not only because of lost income, but also because, as a person with diabetes, Mr. Zapata lost his health insurance coverage to get affordable life-sustaining medication. Also, with his OPT and without a job, Mr. Zapata had only ninety days to find another job or be forced to leave the United States, where he had lived in for the past 8 years.

86.     Only after multiple further iterations of email exchanges of a similar nature did Dr. Simon finally on November 12, 2021, a week after the November 5 official university deadline to submit the dissertation, put an end to the dissertation process by giving her final approval to the dissertation, pending new formatting review by the Graduate School.

87.     Shockingly, the previous day, on November 11, 2021, after Mr. Zapata's resignation from his full-time job became effective, the Associate Dean of Research and Graduate Programs, Dr. Weeks, went to talk to one of the classes Mr. Zapata used to teach and referred to him as a "terrorist" in front of his previous students, presumably as a form of public retaliation against Mr. Zapata for his efforts to protect his rights and to ensure the fairness of Texas Tech's processes and procedures.

88.     As discussed above, the selective enforcement of the "two publications" policy against Mr. Zapata and only against Mr. Zapata further demonstrates discrimination and arbitrariness on the part of Defendants. About two weeks prior to Mr. Zapata's Summer 2021 commencement, the Department and the Graduate School informed Mr. Zapata that they would enforce a policy with respect to him regarding PhD students needing two publications to qualify to graduate, despite the fact that they enforced this supposed "policy" against none of Mr. Zapata's Asian groupmates during the Spring 2021 semester and other Asian PhD students during subsequent semesters. This "two publications" policy states the following: "PhD students

are required to have two publications accepted in peer reviewed journals or indexed conference

proceedings accepted by chair prior to their defense.  These are minimums and individual

departments can have higher standards."  The policy does not appear in the Department's

handbook, which purports to contain the policies, requirements, and procedures governing the

Department.  It is also absent from the university catalog as a requirement for graduation from

the Department's PhD program.  It can be found only in the Whitacre College of Engineering

40.20 operation policy ("WCOE OP 40.20") available only on the Whitacre College of

Engineering website.  Neither Mr. Zapata nor other PhD students in the Department had been

directed to this website as a guide to the policies governing the requirements of the Department.

89.     The Whitacre College of Engineering website does not make clear what

constitutes a valid publication for purposes of WCOE OP 40.20 and no administrator or staff

member from either the Department or the Graduate School could provide any explanation

regarding this issue.  The complete lack of any clear answer regarding this issue provided

unequivocal evidence that the policy was never enforced.  It was dredged up only in connection

with Mr. Zapata, alone among the PhD students in the Department.

90.     In fact, Mr. Zapata is aware of at least ten (10) similarly situated students, all

Asian and of Asian national origins, who were permitted to graduate despite not meeting the

"two publications" requirement.  Six (6) of these Asian students had Dr. Simon as their PhD

advisor and were Mr. Zapata's research groupmates.  Three of these six were from China and

graduated from Texas Tech in the Spring 2021 semester with a PhD with only one paper

accepted or published.  Two were from Bangladesh and similarly graduated from Texas Tech in

the Spring 2021 semester with a PhD with only one paper accepted or published.  At least one of

these individuals still has only one published paper even to this day.  Others published a second

paper only long after their graduation from Texas Tech. One student from India graduated with two publications, but on one of those publications he was listed as third author, such that it would not have qualified as a publication at all for purposes of the "two publications" requirement as it was finally communicated to Mr. Zapata. Based on the apparently *ad hoc* requirement communicated to Mr. Zapata, a publication only counted for a first author.

91.     Four of the six individuals discussed above who had Dr. Simon as their dissertation advisor were awarded their PhDs in Spring 2021, precisely when Mr. Zapata expected to graduate. Texas Tech did not enforce the "two publications" policy against any of the ten individuals discussed above who were permitted to graduate before, during, and after Mr. Zapata expected to graduate. This policy was disparately applied to Mr. Zapata because he was Hispanic.

92.     None of the six individuals discussed above, all of whom had Dr. Simon as their advisor, evaded the "two publications" policy through subterfuge. In fact, each one of them clearly wrote in the introduction of their doctoral dissertation that they had one single published or accepted publication by the time of their doctoral defense, in ostensible violation of the supposed "two publications" policy. All four of their dissertation committee members, of which three were composed of Department faculty, read, and accepted the dissertation of these Asian students, fully knowing that they only had one valid publication.

93.     Defendant Dr. Simon was the Chair of the doctoral committee and her husband, Dr. McKenna, was part of the doctoral committee for each the six (6) Asian students described above. Both Defendant Dr. Simon and Defendant Dr. Botte were the chairs of the Department during the graduation of several of the Asian students described above, were responsible for enforcing the Department's rules, and were aware of the unequal enforcement of the "two

publications" policy.  Defendant Dr. Sheridan approved the conferral of the PhD for each of the
ten (10) Asian students in all cases described above.

94.     As noted above, on or about July 26, 2021, the Dean of the Graduate School, Dr.
Mark Sheridan, informed Mr. Zapata that one reason why he would not be allowed to graduate
on time was that he did not meet the "two publications" requirement.  When Mr. Zapata asked
for clarification regarding the requirement and which of his own published papers would qualify
for purposes of the requirement, Dr. Sheridan provided no clear criteria but indicated simply that
Mr. Zapata was deemed to have only one qualifying publication.

95.     As noted above, Dr. Sheridan was able to provide Mr. Zapata with a "special
permission" after Dr. Simon requested it to take the qualifying exam after two years of
matriculation, despite the rule in the WCOE OP 40.20 found immediately below the "two
publications" requirement:

> **2. PhD Student Requirements**
>
> **A: Publication Requirements**
>
> PhD students are required to have two publications accepted in peer reviewed journals or
> indexed conference proceedings accepted by chair prior to their defense. These are minimums
> and individual departments can have higher standards.
>
> **B: Qualifying Exam for Candidacy**
>
> All incoming PhD students must complete their qualifying exam within the first 2 years of
> matriculation into the graduate program.  The only exception are part-time PhD students who
> should complete their qualifying exam within the first 39 hours of matriculation.

Dr. Sheridan had been able to grant an exception to WCOE OP 40.20 with respect to the timing
of the qualifying exam, upon the request of Dr. Simon.  However, he disavowed any ability to
assist Mr. Zapata in addressing the "two publications" requirement, despite at least ten of the
Asian PhD students in the Department not having to comply with this supposed requirement.

96.     Because Dr. Sheridan stated in his July 28, 2021, email that the Graduate
Committee of the Department was responsible for determining what work satisfied the "two

publications" rule, Mr. Zapata decided to reach out to the Department's Graduate Advisor, Dr. Chau-Chyun Chen, for clarification.  In response, on July 28, 2021, the same day that Dr. Sheridan asked Mr. Zapata to seek clarification from the Graduate Committee, Dr. Chen advised Mr. Zapata to get the exact interpretation of the policy from the College of Engineering or the Graduate School.  It thus seemed apparent that no relevant individual or entity within Texas Tech had the ability and/or willingness to delineate the precise contours of the "two publications" requirement for Mr. Zapata.

97.     On or about August 5, 2021, because he was concerned about his position as an instructor for the Department, Mr. Zapata met with the Chair of the Department, Dr. Gerardine Botte.  Dr. Botte recommended to Mr. Zapata to "let it go" when he told her that Texas Tech was enforcing the "two publications" requirement inequitably against him, as discussed above.  Dr. Botte admitted, however, that it was inappropriate for Dr. Simon to continue as Mr. Zapata's dissertation advisor while working full time at NC State and that she needed to assign a delegate advisor until the dissertation was closed.  Dr. Botte also indicated that she would talk further with Dr. Brandon Weeks to decide who the delegate advisor would be.  Despite multiple precedents in the Department where Asian PhD students were assigned a delegate advisor or co-advisor upon the departure of their previous advisor, Mr. Zapata was never assigned one.

98.     On or about August 20, 2021, after receiving an email from Mr. Zapata requesting clarification about the "two publications" requirement, Dr. Botte informed Mr. Zapata that she had sent the request to the Department's Graduate Committee and that she was waiting to hear their evaluation of the request.  On or about August 24, 2021, Dr. Chen, after meeting with the Graduate Committee, indicated that: (1) to count towards the requirement, a publication must be written with the dissertation advisor, (2) Mr. Zapata would need to be the first author on the

publication, and (3) it was not necessary for the publication to go into the dissertation itself.  On information and belief, this "clarification," which Dr. Chen had been unable or unwilling to provide to Mr. Zapata himself previously, was merely an *ad hoc* determination in response to Mr. Zapata's request for clarification, had no basis in actual institutional practice, and had never been employed in connection with any of Mr. Zapata's Asian peers.  Particularly by insisting that Mr. Zapata write the publication with his dissertation advisor and serve as the first author, this Graduate Committee "clarification" further cemented the inequities in the relationship between Mr. Zapata and his Asian peers, which each member of the Committee not only knew about, but help perpetuate with their own students.  On information and belief, the members of the Graduate Committee took this step in retaliation for Mr. Zapata's complaints about this past discrimination.

99.      Each member of the Graduate Committee responsible for this inequitable and retaliatory approach (Dr. Chen, Dr. Wei Li, Dr. Siva Vanapalli, and Dr. Harvinder Singh Gill) has either allowed their own Asian PhD students to graduate after breaking the "two publications" rule or the *ad hoc* rules imposed on Mr. Zapata and/or has not allowed Hispanic PhD students, such as Mr. Zapata, to defend their doctoral dissertation despite meeting all the requirements to defend, including the "two publications" rule.

100.      On or about June 22, 2021, another student in the Department, an Asian from Bangladesh with Dr. Simon's husband as his advisor, was allowed to defend his dissertation and eventually graduate with a PhD in Summer 2021 without complying with the "two publications" rule, despite the fact that this rule was referenced as a ground for refusal to allow Mr. Zapata to graduate during the same semester.  This student from Bangladesh had one published paper as a first author and one published paper as a fourth author prior to his defense and graduation.  As

was common in cases where Asian students were allowed to graduate without fulfilling the "two publications" rule, this student had Dr. McKenna, Dr. Simon, and Dr. Rajesh Khare ("Dr. Khare") as his doctoral committee members from the Department.

101.    In light of the Department's continued refusal to deny Mr. Zapata his degree based on a policy that it completely disregarded for similarly situated Asian students, Mr. Zapata sent an email to Dr. Chen on August 24, 2021, noting the disparity between his treatment and the treatment of six Asian students referenced above.  After a follow-up email on September 3, 2021, Dr. Chen responded that he was scheduling a Graduate Committee meeting to discuss if Mr. Zapata could be allowed to graduate with one publication, in accordance with the treatment afforded to his Asian peers.  Ultimately, Dr. Chen merely indicated that Mr. Zapata should focus on the dissertation "corrections" underway with Dr. Simon and to revisit the "two publications" issue only after those "corrections" were complete, and the dissertation approved.  Dr. Chen thus avoided addressing one example of discriminatory conduct only by deferring its resolution until another example of discriminatory conduct had run its full course.

102.    After further correspondence on this issue, Mr. Zapata met virtually with Dr. Chen on September 8, 2021.  During this meeting, Dr. Chen told Mr. Zapata explicitly that, although the six Asian students referenced above were, in fact, permitted to graduate with one publication, Mr. Zapata would nevertheless still be required to comply with the "two publications" requirement.  Dr. Chen gave no explanation for this disparate treatment.

103.    On or about September 9, 2021, Mr. Zapata met with the Dean of the College of Engineering, Dr. Sacco, to seek further clarification regarding the above-mentioned disparate treatment with respect to his Asian peers, who had been allowed to graduate without fulfilling the "two publications" rule.  During this meeting, Dr. Sacco, who was the highest authority regarding

the College's rules, expressly confirmed that there were several students, even beyond those of Dr. Simon, who were allowed by current faculty members to graduate with only one valid publication. Despite this admission, he informed Mr. Zapata yet again that he himself was nonetheless still required to meet this "two publications" standard.

104.    Dr. Sacco further stated during the September 9, 2021 meeting: "I had a discussion with her [Dr. Simon] about the previous people that got out with only one paper, and she did not respond.  Well, she doesn't have to, anymore.  She is not here."  Dr Sacco further stated during the same meeting: "I cannot do anything about [Dr. Simon] or McKenna [Dr. Simon's husband] because they left the institution, but there are some within the institution that I am not happy about because, from my perspective, they violated a sacred trust, and I won't forget that very easy." Despite these rhetorical flourishes, Dr. Sacco did nothing to alter the fact that Dr. Simon still continued as Mr. Zapata's dissertation advisor and second publication advisor while other faculty members were in fact allowed to keep breaking the "two publications" standard with their students—all from Asian countries—during the same Fall 2021 semester and coming semesters.

105.    On or about September 27, 2021, Dr. Sacco sent a retaliatory email that threated Mr. Zapata's spousal accommodation and his full-time instructor position for the Department: "…you need to get your 2nd paper accepted for you to be graduated.  This has been the requirements of the WCOE for many years.  I thought when we met you agreed to do this?  If this is not the case, please let me know for in[sic] has an impact on my agreement to help with your appointment as a spousal accomendation[sic].  As for the rest that is between you and your advisor.  Please get the 2nd paper out ASAP."  Although Mr. Zapata had made it clear in previous emails that the paper submission process was fully controlled by Dr. Simon and rested entirely in her hands and although Dr. Chen had made clear that the *ad hoc* "two publications" rules

imposed only on Mr. Zapata required that the publication had to be written with the dissertation advisor, Dr. Sacco placed the blame for the lack of a second publication squarely on Mr. Zapata. Texas Tech and its relevant agencies and representatives thus (1) required only Mr. Zapata to meet the "two publications" requirement and created additional *ad hoc* requirements to the policy to make it more difficult for Mr. Zapata to graduate; (2) demanded that he meet this requirement with a publication written in conjunction with his dissertation advisor; (3) refused to allow him to change his dissertation advisor from Dr. Simon, who was no longer at Texas Tech and who had, in any event, demonstrated a clearly discriminatory approach both with respect to this very "two publications" requirement and with respect to other issues involving Mr. Zapata; and then (4) threatened Mr. Zapata's continued employment when the second publication was not forthcoming under circumstances in which they themselves had reinforced the obstacles hindering its progress.

106.   On or about November 14, 2021, after Dr. Simon finally fully approved his doctoral dissertation, Mr. Zapata sent an email to Dr. Sheridan asking him if he would now receive his PhD. Dr. Sheridan replied to Mr. Zapata on or about November 19, 2021, making it clear that he still wanted Mr. Zapata to keep working with Dr. Simon to get his second publication submitted and accepted. After Mr. Zapata followed up the same day about why he was still required to fulfill the "two publications" rule, when the second publication now depended entirely on Dr. Simon's actions, Dr. Sheridan replied on or about November 22, 2021, defending the position that Mr. Zapata still needed to have another paper accepted and published. Dr. Sheridan continued to deny Mr. Zapata a PhD degree based on the "two publications" rule, despite the evidence Mr. Zapata had provided in his grievance letter to him on October 14, 2021. Dr. Sheridan was fully aware that the "two publications" policy was disparately applied to Mr.

Zapata.

107.    Dr. Simon finally submitted a publication that included data from Chapter 7 of Mr. Zapata's dissertation on December 1, 2021—nine days prior to Mr. Zapata's Fall 2021 commencement and approximately 34 days after Dr. Simon herself committed to submit this publication—with Mr. Zapata listed as the third author.  Even after the submission process, Dr. Simon intentionally continued to delay the publication process for several more months.  In the final version of the manuscript published online on May 20, 2022, Dr. Simon left out the author contribution section showing that Mr. Zapata did the experimental work for some experiments, as previously agreed by Mr. Zapata and Dr. Simon in order to submit the publication.  Dr. Simon deprived Mr. Zapata of proper recognition for his intellectual ideas.

108.    On or about December 2, 2021, the Associate Dean of Research and Graduate Programs, Dr. Weeks, asked Mr. Zapata to meet with him.  In this meeting, Dr. Weeks proposed that Mr. Zapata send an email to Dr. Sacco asking him for "a special disposition" towards the approval of Mr. Zapata's PhD degree for the Fall 2021 given that Dr. Simon had finally submitted a publication the previous day.  None of Mr. Zapata's former Asian peers, who were allowed to graduate without meeting the "two publications" rule, were required to ask for "a special disposition."  Nonetheless, Mr. Zapata accepted Dr. Weeks' suggestion since he was desperate to finally obtain his PhD and get out of a toxic environment.  The same day, on December 2, 2021. Mr. Zapata sent an email to the Dr. Sacco asking for the "special disposition."

109.    On December 2, 2021, a few minutes after Mr. Zapata asked for the "special disposition," Dr. Sacco replied and waived the acceptance requirement of Mr. Zapata's second publication, noting simply: "Given the circumstances, I agreed to waive the acceptance

requirement."

110.    The following day, on December 3, 2021—only seven days away from the Fall 2021 commencement ceremony—Dr. Sheridan replied and finally accepted that Mr. Zapata had completed all the requirements for his PhD degree.  Mr. Zapata had effectively requested such a "special disposition" for months.  It was only granted after Mr. Zapata had lost his job and his health insurance and had compromised his mental health severely.  Despite Dr. Sheridan's acknowledgement that Mr. Zapata had fulfilled all his PhD requirements, the Graduate School delayed its official confirmation of degree completion until December 9, 2021, one day prior to Mr. Zapata's Fall 2021 commencement ceremony.  This confirmation was made through "DegreeWorks," the official Texas Tech online platform for monitoring academic progress.  Upon information and belief, the Graduate School— chaired by Dr. Sheridan— did not subject other PhD students in the Department to such delay and uncertainty regarding graduation eligibility so close to their official commencement ceremony.

111.    In an apparent effort to counterbalance the positive impact of finally accepting that Mr. Zapata had completed his degree requirements, Dr. Sheridan sent him another email stating that, "after further consideration," Mr. Zapata's girlfriend, who was a faculty member at Texas Tech due to her tenure-track position, would no longer be allowed to be his hooding professor at the graduation ceremony.  According to Dr. Sheridan, she was "not a member of the graduate faculty."  However, Dr. Sheridan was fully aware that Mr. Zapata's girlfriend was in fact a member of the graduate faculty and that she had previously been permitted to be his hooding professor for the Summer 2022 graduation.  In fact, on or about July 14, 2021, Dr. Sheridan himself had approved her to be Mr. Zapata's hooding professor during the Summer 2022 commencement.  In addition, Mr. Zapata's girlfriend received confirmation from the

Graduate School on or about November 18, 2021, that she was still his hooding professor.  Dr. Sheridan's email was clearly retaliatory in nature.

112.    After Mr. Zapata expressed his concerns about this development in further communication, Dr. Sheridan asked him to meet on December 6, 2021.  Having been informed by Dr. Weeks that Mr. Zapata intended to propose to his girlfriend at the hooding ceremony, Dr. Sheridan informed Mr. Zapata at this meeting that he should not propose to his girlfriend if he wanted to participate in the commencement ceremony.  Mr. Zapata was devastated.

113.    Notably, during the Fall 2021 graduation ceremony of the Texas Tech University Health Science Center, also part of the Texas Tech system, another student proposed to his girlfriend, and his proposal was celebrated in different newspapers, including one from the Texas Tech system.

114.    During and after Mr. Zapata's Fall 2021 graduation process, the College of Engineering and the Department have continued to allow other students – all from Asian national origins and working with advisors from Asian national origins – to break the "two publications" rule.  For example, on or about November 29, 2021, one Asian student from Bangladesh from the research group of Dr. Siva Vanapalli was allowed to defend her dissertation without having a single publication published or accepted.  Similarly, the College of Engineering and the Department have allowed at least two other Asian students with Asian national origins and working with advisors from Asian national origins to break the *ad hoc* rules and/or the "two publications" rule during the Summer 2022 semester, after Mr. Zapata had already graduated.

115.    Specifically, on or about June 23, 2022, two students of Asian ethnicities and with Asian advisors were allowed to defend their doctoral dissertations without fulfilling the *ad hoc* rules and/or the "two publications" rule.  One of the students, whose advisor was Dr. Vanapalli,

only had one accepted paper in a peer-reviewed journal as a third author by the time of his defense.  The second student, whose advisor was Dr. Chen, was allowed to defend her dissertation with one first author and one second author publications in peer reviewed journals, breaking the *ad hoc* rules that her own advisor imposed on Mr. Zapata for months.  Both students graduated with a PhD during the Summer 2022 commencement ceremony, with the second student also notably obtaining a Master's degree during the same Summer 2022 commencement ceremony, without the need to be enrolled in a Master's degree program.  As was common in cases where Asian students were allowed to graduate without fulfilling the "two publications" requirement, one of these two students had Dr. Chen, Dr. Vanapalli, and Dr. Khare as her doctoral committee members from the Department.  Similarly, the other had Dr. Vanapalli, Dr. Wei Li, and Dr. Jeremy Marston as his doctoral committee members from the Department.  As was the case with the other students described above, the violation of the "two publications" requirement was both open and obvious.

116.    Out of the other four Hispanic students that Mr. Zapata knows were pursuing a PhD in the Department during the period of 2016-2021, two did not complete the program and left with a terminal Master's degree, one completed her PhD after at least seven years in the program, and one remained in the program until the end of the Fall 2022 semester.  The Hispanic PhD student that completed the program after at least seven years also had Dr. Simon as an advisor and had two first-author publications in peer reviewed journals for almost four years prior to Dr. Simon allowing her to defend her dissertation.  There was no reasonable justification for the delay. In fact, this Hispanic student and Mr. Zapata, were the only Hispanic students in Dr. Simon's group and the only two students explicitly required to have two publications before graduation.

117.    The Hispanic PhD student who remained in the Department until the Fall 2022 semester had Dr. Gill as his advisor and had already successfully passed all relevant graduation requirements, including the "two publications" requirement, but he was only allowed to defend his dissertation in the Fall 2022 semester.  He had already had two first-author publications and two second-author publications, all in peer review journals, and in addition, had one patent where he was the third author, all completed years prior to his advisor allowing him to defend his dissertation.  Despite his credentials, which far surpassed those of the ten Asian students previously referenced in this complaint who were allowed to defend their dissertations, on information and belief, Dr. Gill required this Hispanic student to have even more first-author publications than the "two publications" requirement specified before he would be allowed to defend his doctoral dissertation.  On information and belief, the disparity in the treatment of this student as opposed to the treatment of other Asian peers in the Department occurred because he is Hispanic.

**D.    Dr. Simon's Efforts to Delay the Publication Process.**

118.    As the Chair of the Department from 2012 to 2019, Dr. Simon knew the publication rules of the College of Engineering outlined in the WCOE OP 40.20.  After Dr. Simon sent her July 22-23 emails discussed above and even after Mr. Zapata's graduation with his PhD, Dr. Simon hindered Mr. Zapata's ability to comply with the "two publications" standard by controlling the submission process and misleading Mr. Zapata into believing that several chapters of his dissertation were going to be published in a short period of time.  Dr. Simon's actions were discriminatory directed towards Mr. Zapata in retaliation for his multiple complaints about her discriminatory behavior toward him.  Dr. Simon used her control of the publication process to further her goal of continuing to delay Mr. Zapata's PhD graduation.

None of Mr. Zapata's Asian peers experienced this level of publication delay or these types of dilatory tactics.

119.    With respect to Chapters 4, 5, and 7 of Mr. Zapata's dissertation, Dr. Simon repeatedly indicated to Mr. Zapata that she was optimistic that, within a very short period of time from the correction of certain "issues," the transmission of certain data, or the completion of various other steps, the chapters would be ready for publication.  In each case, she changed her vantage point repeatedly and delayed the process so that the chapters would never be "ready" according to her ever-changing criteria.  On information and belief, she engaged in no such behavior with respect to Mr. Zapata's Asian peers.  On information and belief, her behavior was driven by motivations based on discrimination and retaliation.

**E.    Wrongful Actions and Omissions of Other Texas Tech Departments and Agencies**

120.    During the months of July 2021 to December 2021, Mr. Zapata reached out to representatives of the following Texas Tech departments for help: 1) the Department, 2) the College of Engineering, 3) the Graduate School, 4) the Title IX office, 5) the office of Equal Opportunity, 6) the office of the Dean of Students, 7) Human Resources, 8) the division of Diversity, Equity & Inclusion, 9) the Provost's office, and 10) the Board of Regents.  Mr. Zapata made representatives of all the departments, except the Board of Regents, aware of 1) Dr. Simon's abusive discriminatory and retaliatory behavior towards him, 2) the fact that Dr. Simon was a full-time faculty member at another institution with unilateral power over his dissertation and publication process, and 3) the "two publications requirement" issue, including the failure of the Department and other Texas Tech agencies to apply this requirement to Mr. Zapata's Asian peers.  The above-referenced departments and agencies either were unable to help Mr. Zapata, dismissed his concerns, or told him to reach out to other departments.  No department at Texas

Tech could or would help Mr. Zapata.  Texas Tech failed him at every level.

121.    By way of example, on or about August 13, 2021, Mr. Zapata discussed his concerns with the Senior Vice Provost of Texas Tech Dr. Robert Stewart ("Dr. Stewart") through phone and email.  Mr. Zapata even offered audio, written, and witness proof to back up his concerns.  Dr. Stewart dismissed these concerns and requested that Mr. Zapata simply keep working with Dr. Simon.  On or about August 22, 2021, Mr. Zapata followed up with the Dean of the Graduate School, Dr. Sheridan, about some of the concerns he discussed with Dr. Stewart, in particular: 1) questioning why he was still required to make corrections to his dissertation when his doctoral committee, which included Dr. Simon, signed the "ORAL DEFENSE and THESIS-DISSERTATION APPROVAL FORM," indicating their approval of the written dissertation, and 2) indicating and offering evidence that the Graduate School granted PhD degrees to Asian students who did not meet the "two publications."  Like Dr. Stewart, Dr. Sheridan responded by dismissing Mr. Zapata's questions and indicating that he should keep working with Dr. Simon and should re-address the publication requirement issues with the Department.  Despite Mr. Zapata's multiple emails later in which he made Dr. Sheridan aware of the disparity of treatment, culminating in his filing of a formal grievance letter with him, Dr. Sheridan never addressed many of these concerns and never dealt with the grievance letter at all.

122.    By way of further example, on or about September 14, 2021, Mr. Zapata contacted the Title IX office, which besides Title IX violations also investigates discrimination and harassment based on any protected characteristic.  Mr. Zapata received a phone call the following day on or about September 15, 2021, from a Title IX Administrative Investigator named Mr. Tyler Patrick to whom he detailed several instances of discrimination and retaliation by Dr. Simon, including the unequal application of the "two publications" rule.  Mr. Zapata was

told that the Title IX office would not be able to investigate, even though Dr. Simon was still acting as his advisor at Texas Tech and even though other departments and agencies of Texas Tech were actively facilitating her continued discriminatory conduct towards Mr. Zapata, because Dr. Simon had a full-time position at another institution.  In further email communications, Mr. Patrick reiterated that his office could neither investigate nor take any substantive action with respect to Mr. Zapata's situation, regardless of the evidence Mr. Zapata could produce to support his allegations.  The Texas Tech Office of Equal Opportunity provided a similar response, based on Dr. Simon's departure from Texas Tech and her status as a professor at another educational institution.

**F.     The Department's History of Discrimination**

123.    The inability and/or unwillingness of these Texas Tech departments and agencies to assist Mr. Zapata in any way or to curb the rampant discrimination described above is particularly problematic in light of the long history of discrimination within the Department. The Department, chaired by Dr. Simon from 2012 to 2019 and by Dr. Gerardine Botte from 2019 to 2022, has a long history of discriminatory behavior towards Hispanics and other ethnic groups.  According to the College of Engineering Website, the Chemical Engineering program has been accredited since 1959 and has granted PhD degrees since at least around 1973.  Out of at least about 190 PhD degrees conferred by the Department in the period of 1973-2021, 163 (85.79 %) were conferred to people from Asian ethnicities, 24 (12.63%) to Whites or mixed Whites, 2 (1.05 %) to Hispanics, and 1 (0.53 %) to a Black/African American.  In fact, out of the about 163 PhD degrees conferred to people from Asian ethnicities, 154 (94.48%) were from only four nationalities: China, India, Bangladesh, and Iran.

124.    The Department itself provides a glimpse of this racial disparity in the "Recent

46

Graduates" section of its website, where, out of the 53 students listed to have graduated with a PhD in the period of 2013-2018, 51 of those students are Asian and not a single Hispanic student, Black student, or member of another minority group besides Asian is listed.

125.     While the above-referenced imbalance in the historical population of students in the Department does not *per se* establish discrimination, when combined with the fact that at least ten of the most recent of these Asian students were not required to comply at all with rules that were enforced vigorously against otherwise similarly situated Hispanic PhD students, it leads to a reasonable inference of discriminatory intent and impact both historically and at present.

126.     In fact, Mr. Zapata was the first foreign-born Hispanic to obtain a PhD in the Department's 48-year history of granting that degree.

127.     Although Texas Tech touts itself as a "Hispanic Serving Institution," a designation which requires a total undergraduate Hispanic student body above 25%, and is located less than six hours by car from the Mexican border, Texas Tech does not now have and historically never has had equal representation of Hispanics in the graduate student and faculty bodies of the Department.

128.     When members of the Department (Dr. Botte, Dr. Weeks, Dr. Chen, Dr. Vanapalli, Dr. Li, and Dr. Gill), the College of Engineering (Dr. Sacco), and the Graduate School (Dr. Sheridan) were made aware of Dr. Simon's discriminatory behavior towards Mr. Zapata, they responded uniformly by protecting Dr. Simon and denying Mr. Zapata the opportunity to graduate with one publication as his Asian group members or to change advisors or to have a co-advisor, as the Department has done in multiple occasions with Asian students.  These members of the Department thus facilitated Dr. Simon's discriminatory behavior and allowed it to

continue unchecked.

**G.   Unequal and Discriminatory Treatment in the Department's Award of Master's Degrees**

129.   The Department, the College of Engineering, and the Graduate School are involved in allowing PhD students to graduate with a Master of Science ("MS") degree without fulfilling the usual university policies or without even having enrolled in the MS program, having enrolled only in the PhD degree program. This practice artificially inflates the number of students that obtain MS degrees, favoring metrics.

130.   According to every handbook version published by the Department, students require a total of either 30 or 36 credits to graduate with an MS degree, depending on whether it is with thesis or non-thesis. In particular, the MS non-thesis program requires students to take the same core courses than a PhD student takes and a lesser number of course electives, seminar courses, and research credits than a PhD student, with the addition of a "comprehensive exam."

131.   Although there is an overlap between the requirements of an MS non-thesis student and a PhD student, the Department handbook makes a distinction between the PhD and MS degrees, and nowhere indicates that by completing a PhD a student is also entitled to receive or request an MS degree.

132.   The "comprehensive exam" needed for the students pursuing an MS non-thesis degree is supposed to be provided either by the faculty under whom the student takes research credits or the student graduate committee (depending on the version of the Department's handbook the student falls under), with an exam format that "could include a written report and a presentation." There is no indication in the Department's handbook or in any Texas Tech policy that the qualifying exam designed for PhD students can replace the MS comprehensive exam.

133.   As part of its general strategy of favoring its Asian students, for several years the

Department has allowed several PhD students, the majority of whom derive from Asian national origins, to obtain an MS non-thesis degree without the need for enrollment in an MS program and allowing them to use their PhD qualifying exam as a replacement for the MS program's "comprehensive exam." On information and belief, Dr. Botte, Dr. Chen, Dr. Vanapalli, Dr. Li, and other members of the Department have permitted their PhD students to receive MS degrees in this manner.

134.    While Mr. Zapata was eventually able to graduate with a PhD degree at the end of the Fall 2021 semester, he was not given an MS degree and was never informed of any mechanism by which he could obtain such a degree in the manner described above. Once again, the Department and its members showed a disparity of treatment favoring predominantly PhD students of Asian national origin.

135.    From on or about August 22, 2022, to September 23, 2022, Mr. Zapata communicated with the Acting Dean of the College of Engineering, Dr. Stephen Bayne, the Interim Dean of Research and Graduate Programs, Dr. Rajesh Khare, and the Dean of the Graduate School, Dr. Mark Sheridan, concerning the disparity of treatment with respect to the award of MS degrees in the Department and requested that they grant him a non-thesis MS degree, in accordance to the standard of treatment of his Asian peers, or alternatively to indicate him what steps, if any, he could take to receive the non-thesis MS degree.

136.    Dr. Khare and Dr. Sheridan informed Mr. Zapata in separate emails in mid-September 2022 that he would not be granted an MS degree because "a degree cannot be conferred retroactively." Neither they nor any other member of any Texas Tech department or agency informed him at any time of any steps he could take to receive such a degree.

137.    On or about September 19, 2022, Dr. Sheridan confirmed that a PhD student is, in

fact, able to request a Master's degree, even if not enrolled in a Master's program, as long as the student requests the degree "along the way" of their PhD studies (*i.e.*, at any point after passing the qualifying exam and prior to the student's graduation).  Despite Mr. Zapata's requests for further information, Dr. Sheridan could point to no Texas Tech policy that would dictate that "a degree cannot be granted retroactively" or that a PhD student could legitimately request a Master's degree "along the way" of their PhD studies.  On information and belief, no such policy or policies exist.

138.    Based on the above-referenced practices of the Department and Dr. Sheridan's representations, Mr. Zapata could have obtained an MS degree since the Fall 2018, if Dr. Simon had followed the Department's written policies and had given Mr. Zapata the qualifying exam within a two-year framework.  A dual MS degree qualification would have provided Mr. Zapata with greater job opportunities and economic gains, particularly when he was forced to resign his full-time instructor position in the Department and find another job within ninety days to keep his legal status in the United States.

## H.    Aftermath and Injuries

139.    Mr. Zapata filed discrimination charges with the Office for Civil Rights ("OCR") and with the Equal Employment Opportunity Commission ("EEOC") on or about August 31, 2022.  These entities have not yet signaled to Mr. Zapata that their respective investigations are complete.

140.    As a result of the discriminatory behavior by Texas Tech and several of its officials, Mr. Zapata has been severely damaged in the following ways: he lost money; he lost his job; he lost his health insurance—a particularly grave consequence for a person with diabetes; he was required to pay money and remain in the PhD program for additional academic

semesters; he lost his personal belongings; he also lost his intellectual ideas and was deprived of proper recognition for those ideas; his mental health deteriorated; his ability to reside in the United States was jeopardized; he was forced to make life-altering decisions like moving away from the home he started to build with his partner; he was prevented from proposing to his girlfriend during his graduation ceremony; he is currently being denied an MS degree, to which he is entitled if the same standards are applied to him as have been repeatedly applied to his former Asian PhD student peers.  Mr. Zapata suffered these injuries entirely because Dr. Simon and other Texas Tech officials discriminated and retaliated against him in violation of his constitutional rights.

## CAUSES OF ACTION

### COUNT I

**Race, National Origin Discrimination and Retaliation under Title VI**
**(Against All Defendants)**

141.    Plaintiff incorporates paragraphs 1-140 above as if fully restated here.

142.    Texas Tech requests and receives financial assistance and funding from the federal government.

143.    Plaintiff is Hispanic and thus a member of a racial minority.  The actions and omissions of Defendants in this matter recounted above constitute the intentional exclusion of Plaintiff from the programs and activities of the Department and the denial of its benefits on the ground of race and national origin.

144.    Specifically, Defendants individually and collectively each engaged in some combination of (1) harassing Plaintiff on the grounds of his use of his native language in a manner not directed toward Asians using their native language, (2) enforcing requirements against Plaintiff and other Hispanics not enforced against Asians in the Department, (3) delaying

Plaintiff's graduation in a manner not practiced against Asians in the Department, (4) arbitrarily and capriciously developing, altering, and/or reversing policy interpretations or previously held positions in a manner  designed to thwart or to retaliate against Plaintiff's efforts to seek equitable treatment, (5) denying benefits, such as the MS degree, extended routinely to Asian PhD students in the Department, and (6) facilitating the discriminatory conduct of others.

145.    Defendants' intentional discrimination against Plaintiff described above violated Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

146.    These violations caused Plaintiff substantial injury and were malicious in nature and/or were engaged in with reckless indifference.

## COUNT II

**Denial of Equal Protection Based Upon Race and/or National Origin
42 U.S.C. § 1983**

**(Against All Individual Defendants)**

147.    Plaintiff incorporates paragraphs 1-146 above as if fully restated here.

148.    Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, students and employees of public institutions have the right to be free from unlawful discrimination on the basis of race and/or national origin.  This constitutional right is clearly established.

149.    At all material times, Defendants were persons acting under color of state law within the meaning of 42 U.S.C. §1983 ("Section 1983").

150.    Defendants unlawfully discriminated against Plaintiff on the basis of his race (Hispanic) and his national origin (Colombia) in violation of the Equal Protection Clause. Specifically, Defendants individually and collectively each engaged in some combination of (1) harassing Plaintiff on the grounds of his use of his native language in a manner not directed

toward Asians using their native language, (2) enforcing requirements against Plaintiff and other Hispanics not enforced against Asians in the Department, (3) delaying Plaintiff's graduation in a manner not practiced against Asians in the Department, (4) arbitrarily and capriciously developing, altering, and/or reversing policy interpretations or previously held positions in a manner designed to thwart or to retaliate against Plaintiff's efforts to seek equitable treatment, (5) denying benefits, such as the MS degree, extended routinely to Asian PhD students in the Department, and (6) facilitating the discriminatory conduct of others.

151.    The discriminatory and retaliatory actions and omissions recounted above did not serve any compelling state interest or important government or educational objective.

152.    Defendants did not have a rational basis for discriminating against Mr. Zapata that was linked to a legitimate government or educational interest.

153.    Defendants were motivated by animus toward Mr. Zapata because of his race and/or because of his national origin.

154.    Defendants' violations of the Equal Protection Clause were intentional.  These violations caused Plaintiff substantial injury and were malicious in nature and/or were engaged in with reckless indifference.  Plaintiff sues the Individual Defendants in their official capacities for injunctive relief, with the exception of Dr. Simon and Dr. Sacco who, on information and belief, no longer have official capacities with Texas Tech, and in their individual capacities for damages.

## COUNT III

### Denial of Due Process
### 42 U.S.C. §1983

### (Against All Individual Defendants)

155.    Plaintiff incorporates paragraphs 1-154 above as if fully restated here.

156.     Defendants conduct toward Plaintiff was arbitrary and capricious and thus violated his due process rights under the Fourteenth Amendment of the Constitution.  In particular, Defendants arbitrarily and capriciously engaged in developing, altering, and/or reversing policy interpretations or previously held positions in a manner designed to thwart or to retaliate against Plaintiff's efforts to seek equitable treatment.

157.     Defendants' actions and omissions described above lacked a rational basis.

158.     Defendants' actions and omissions described above were motivated by bad faith and ill will unrelated to academic performance.

159.     Defendants' actions and omissions described above constituted such substantial departures from accepted academic norms that they demonstrate that Defendants did not actually exercise professional judgment.

160.     Defendants' violations of Plaintiff's due process rights were intentional. These violations caused Plaintiff substantial injury and were malicious in nature and/or were engaged in with reckless indifference.  Plaintiff sues the Individual Defendants in their official capacities for injunctive relief, with the exception of Dr. Simon and Dr. Sacco who, on information and belief, no longer have official capacities with Texas Tech, and in their individual capacities for damages.

## COUNT IV

**Racial Discrimination and Retaliation Under 42 U.S.C. § 1981 through
42 U.S.C. § 1983
(Against All Individual Defendants)**

161.     Plaintiff incorporates paragraphs 1-160 above as if fully restated here.

162.     At all material times, Defendants were persons acting under color of state law within the meaning of 42 U.S.C. §1983.

163.     Plaintiff is Hispanic and thus a member of a racial minority.  The actions and

omissions of Defendants in this matter recounted above constitute the intentional exclusion of Plaintiff from the programs and activities of the Department and the denial of its benefits on the ground of race and national origin.

164.    Specifically, Defendants individually and collectively each engaged in some combination of (1) harassing Plaintiff on the grounds of his use of his native language in a manner not directed toward Asians using their native language, (2) enforcing requirements against Plaintiff and other Hispanics not enforced against Asians in the Department, (3) delaying Plaintiff's graduation in a manner not practiced against Asians in the Department, (4) arbitrarily and capriciously developing, altering, and/or reversing policy interpretations or previously held positions in a manner  designed to thwart or to retaliate against Plaintiff's efforts to seek equitable treatment, (5) denying benefits, such as the MS degree, extended routinely to Asian PhD students in the Department, and (6) facilitating the discriminatory conduct of others.

165.    The Department's handbook and other written policies of Texas Tech and its agencies created a contractual relationship between Texas Tech and Plaintiff.  The above-referenced actions and omissions by Defendants involved discrimination with respect to the enforcement, performance, modification, and termination of the terms of the relevant contracts, as well as the enjoyment of the benefits, privileges, terms, and conditions of the contractual relationship.  Defendants dealt with all these aspects of the contractual relationship differently depending on the race of those with whom they had entered into this relationship.  Plaintiff, as a Hispanic, was treated uniformly worse with respect to these aspects of the contractual relationship than were his Asian peers.

166.    Defendants' intentional discrimination against Plaintiff described above violated 42 U.S.C. § 1981 and are enforceable against Defendants, as state actors, through 42 U.S.C.

§ 1983.

167.   These violations caused Plaintiff substantial injury and were malicious in nature and/or were engaged in with reckless indifference.  Plaintiff sues the Individual Defendants in their official capacities for injunctive relief, with the exception of Dr. Simon and Dr. Sacco who, on information and belief, no longer have official capacities with Texas Tech, and in their individual capacities for damages.

## JURY DEMANDED

168.   Pursuant to the Seventh Amendment of the U.S. Constitution and Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues triable of right by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter an order after appropriate proceedings up to and including a trial by jury providing the following remedies:

i.      Granting Plaintiff a permanent injunction enjoining Defendant and its agents and employees from continuing to maintain the policies, practices, customs or usages which discriminate against Plaintiff because of his race or national origin, or which otherwise deprive Plaintiff of his rights and privileges secured by federal and state law;

ii.     Granting Plaintiff a declaratory judgment that the practices, policies, customs, and usages complained of are violative of his rights;

iii.    Ordering Defendant to pay Plaintiff compensatory damages, including damages for emotional distress;

iv.     Ordering Defendant to pay Plaintiff punitive damages, based on malicious conduct;

v.      Ordering Defendant to reimburse Plaintiff for his costs incurred in this litigation, including, but not limited to, reasonable attorneys' fees and expert witness fees and such further,

additional or alternative relief as may appear equitable and just to this Court;

vi.   Ordering Defendant to grant Plaintiff a non-thesis Master's degree in Chemical Engineering and to update Plaintiff's educational records reflecting the award and grades of the non-thesis Master's degree;

vii.   Ordering the individual Defendants to participate in annual mandatory trainings on discrimination based on race and/or national origin;

viii.   Ordering Defendants to adopt a meaningful grievance procedure for resolving complaints of discrimination; and

ix.   Awarding Plaintiff such further and additional relief as the Court may deem just and equitable.


DATED: March 7, 2023                              Respectfully submitted,

                                                   __/s/ Mark Whitburn_____
                                                   Mark Whitburn
                                                   Texas Bar No. 24042144
                                                   Whitburn & Pevsner, PLLC
                                                   2000 E. Lamar Blvd., Suite 600
                                                   Arlington, Texas 76006
                                                   Tel: (817) 653-4547
                                                   Fax: (817) 653-4477
                                                   mwhitburn@whitburnpevsner.com