UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

JOHN ALEXANDER ZAPATA
HINCAPIE,

     Plaintiff,

v.

TEXAS TECH UNIVERSITY, et al.,

     Defendants.

No. 5:23-CV-045-H

## <u>MEMORANDUM OPINION AND ORDER</u>

In this case, the plaintiff, John Alexander Zapata Hincapie, asserts that he faced discrimination based on his race and national origin during his time as a PhD student at Texas Tech University. Specifically, Zapata claims that his PhD advisor and dissertation chair discriminated against him by imposing additional requirements on him and that those requirements caused him to graduate two semesters late. He also argues that Texas Tech and other department officials imposed obstacles to his graduation and supported, contributed to, or left unabated this discriminatory treatment.

Before the Court are the defendants' motion and amended motion to dismiss the plaintiff's amended complaint. Dkt. Nos. 8; 16. The defendants argue that all of the plaintiff's claims should be dismissed because he has failed to plausibly state a claim for relief and the individual defendants are entitled to qualified immunity. The Court denies the first motion to dismiss as moot because it has been superseded by the second motion. The Court grants in full the amended motion to dismiss and dismisses with prejudice Zapata's amended complaint. Zapata has failed to plausibly state a claim for relief, and the individual defendants are entitled to qualified immunity as to his claims.

1.      **Factual and Procedural Background**

    A.      **Factual Allegations[1]**

    Zapata was a PhD student at Texas Tech University in the Chemical Engineering

Department from Fall 2016 to Fall 2021.  Dkt. No. 11 ¶ 19.  He graduated with his doctoral

degree in Fall 2021.  *Id.* ¶ 21.  He claims that during his time as a student his dissertation

chair, Dr. Sindee Lou Simon, discriminated against him based on his race (Hispanic) and

national origin (Colombian) in favor of Asian students in the department.  *Id.* ¶ 24.  He

further alleges that the other defendants "facilitated and exacerbated" Simon's

discrimination against him.  *Id.*  Zapata asserts that this discrimination delayed his

graduation, harmed his mental health, and denied him a master's degree.  *See id.* ¶¶ 40–41,

43, 49, 64, 71–73, 92, 114–17, 138–43; Dkt. No. 22 at 13.

    Zapata claims that Simon "exhibited hostile discriminatory behavior" towards him

during his time at Texas Tech, ultimately culminating in her delayed approval of his

dissertation, which was necessary for his graduation.  *See* Dkt. No. 11 ¶¶ 25–26, 32.  As

general background to her treatment of him, he alleges that Simon yelled at him on

numerous occasions during his time as a student and asked him not to speak Spanish,

though she did not treat her Asian students similarly.  *Id.* ¶¶ 28–31.  He claims that she did

not allow him to work at an outside laboratory for an extended period of time, while

another faculty member allowed his student to do so.  *Id.* ¶ 32.  He also complains that

Simon's research websites do not list his publications, and those sites continued to refer to

him as a "current graduate student" for several months after he graduated.  *Id.* ¶¶ 33–34.

---

[1] These allegations are taken from Zapata's amended complaint (Dkt. No. 11), which the Court
    accepts as true when resolving a motion to dismiss.  *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d
    763, 766 (5th Cir. 2016).

The crux of his claims begins in January 2021 when Simon stated that she would be leaving Texas Tech to teach at another university, so her advisees needed to graduate by May.  *Id.* ¶ 35.  For Zapata, this meant he needed to complete his outstanding degree requirements: taking and defending a qualifying exam and defending his dissertation.  *Id.* ¶ 36.  Typically, students complete their qualifying exam early in their doctoral program, but Zapata "had not previously been allowed to take the qualifying exam[]" before that semester.  *Id.* ¶¶ 36–38.  Zapata claims that Simon also cut his PhD funding that semester, requiring him to take a teaching assistant position.  *Id.* ¶¶ 40–41.  Zapata defended his qualifying exam on February 5, 2021, but Simon later told him that he needed to "perform more experiments and correct 'errors and misinterpretations in the written part of the exam.'"  *Id.* ¶¶ 42, 46.  "[S]he finally agreed to sign his qualifying exam report on or about April 21, 2021."  *Id.* ¶ 48.

Zapata also needed to complete his dissertation to graduate.  In February, Simon told Zapata that "she wanted him now to graduate in the Summer 2021 semester and to defend his doctoral dissertation after the Spring 2021 graduation deadline."  *Id.* ¶ 43.  She set his doctoral defense for May 13, 2021.  *Id.* ¶ 44.  Zapata passed his doctoral defense on that date, and all of his committee members, including Simon, signed the official approval form.  *Id.* ¶ 52.  But "a few minutes after signing the official approval form," Simon emailed Zapata to tell him that his "dissertation d[id] NOT meet [her] approval yet" and that additional changes were needed.  *Id.* ¶¶ 53, 55–56.  With Simon withholding her final approval, Zapata became concerned that he would not be able to graduate in Summer 2021.  *Id.* ¶¶ 55–57.  He contacted the Graduate School and "was told not to worry" because "a 'Dean' was going to step in and assume Dr. Simon's role as his dissertation approver if Dr.

Simon did not take action close to his graduation." *Id.* ¶ 57.  True to its word, the Graduate School assigned Dr. Brandon Weeks, the Dean of Research and Graduate Programs, to be Zapata's dissertation approver on July 22, 2021.  *Id.*  And after Weeks was appointed, Simon sent an email to Zapata, Weeks, and Dr. Mark Sheridan, the Dean of the Graduate School, including a list of corrections that she believed were necessary to Zapata's dissertation.  *Id.* ¶¶ 51, 59.

However, once Weeks stepped in, he informed Zapata that he also needed to satisfy his program's two-publication requirement in order to graduate.  *Id.* ¶ 60.  This two-publication requirement provides that "PhD students are required to have two publications accepted in peer reviewed journals or indexed conference proceedings accepted by chair [sic] prior to their defense."  *Id.* ¶ 103.  To count towards the requirement, Zapata was told that the publication must be written with the student's dissertation advisor and the student must be the first author.  *Id.* ¶ 106.  Zapata did not have two publications prior to his May 2021 defense.  *See id.* ¶ 86.  Once Weeks told him about the two-publication requirement, Zapata complained that "at least six of Dr. Simon's previous students were allowed to graduate without fulfilling" this requirement.  *Id.* ¶ 60.

A few days after Simon's email with the corrections and Weeks's communication about the two-publication requirement, Sheridan informed Zapata that "he would no longer be able to graduate in August 2021."  *Id.* ¶ 64.  Sheridan stated that Zapata needed to obtain Simon's approval of his dissertation and satisfy the two-publication requirement in order to graduate.  *Id.*  Zapata asked Sheridan if he could appeal this decision and if he could replace Simon as his advisor, but he was unable to do so.  *Id.* ¶¶ 65, 67.  On August 4, 2021, Zapata sent Simon an updated dissertation.  *Id.* ¶ 74.  Simon responded with additional corrections

on August 23, 2021.  *Id.* ¶ 77.  Upset with what he perceived as shifting requirements, Zapata asked Sheridan when the need for additional corrections would cease.  *Id.* ¶ 79. Sheridan stated that "the process will end when [Zapata has] fully, completely, and accurate[ly] addressed the points raised by Dr. Simon in her 8/23/2021 email message."  *Id.* (second alteration in original).  A few days later, Zapata asked Simon whether other chapters of his dissertation had met her approval, to which she provided several new corrections.  *Id.* ¶ 81.

In late September, Sheridan asked Zapata about the status of his dissertation.  *Id.* ¶ 84.  Zapata responded with his complaints about Simon's continued requests for new corrections, the unfairness that she was still his committee chair after she left Texas Tech while other students had received a new chair, and that other students had graduated without two publications.  *Id.*; *see also id.* ¶¶ 68, 70.  Sheridan told Zapata to "make a 'best faith effort' to address" Simon's concerns and stated that he would convene a committee if revisions did not resolve the continued need for corrections.  *Id.*  A few days later, Simon told Zapata that chapter five of his dissertation was fine, only to later send further corrections.  *Id.* ¶ 85.  Simon sent additional corrections on October 14, 2021.  *Id.* ¶¶ 89–91. That same day, Zapata filed a grievance letter about Simon's treatment of him, the two-publication requirement, and the need for new corrections.  *Id.* ¶ 87.  He then emailed Simon, Sheridan, Weeks, Dr. Gerardine Botte, the Chair of the Chemical Engineering Department, and Dr. Albert Sacco, the Dean of the College of Engineering, that he had filed this grievance based on disparate treatment and intentional discrimination.  *Id.* ¶¶ 63, 86, 88.

– 5 –

Simon finally signed off on his dissertation on November 12, 2021.  *Id.* ¶ 93.  With the dissertation approved, Zapata asked Sheridan if he would be able to graduate that fall.  *Id.* ¶ 114.  Sheridan indicated that Zapata still needed to complete two publications.  *Id.*  The second publication was delayed at one point by a prospective co-author, Dr. Luigi Grassia, who is not alleged to have any connections to Texas Tech.  *Id.* ¶ 89.  Simon submitted a publication on December 1, 2021, with Zapata listed as the third author, which therefore would not satisfy the two-publication requirement.  *See id.* ¶¶ 106, 116.  Nevertheless, the following day, Weeks proposed that Zapata request a special disposition so that he could graduate without satisfying the two-publication requirement.  *Id.* ¶ 117.  Zapata did so, and Sacco granted the special disposition, permitting Zapata to graduate that fall.  *Id.* ¶¶ 117–19.

Zapata's eventual commencement did not go fully according to his wishes.  In the middle of these events, his girlfriend had joined the faculty of Texas Tech, and Zapata wanted to have her as his hooding professor.  *Id.* ¶¶ 50–51, 120.  He also hoped to be able to propose to her "at the moment when she was hooding him."  *Id.* ¶¶ 51, 121.  Zapata's girlfriend had been permitted to be his hooding professor for the Summer 2021 commencement.  *Id.* ¶ 120.  However, Sheridan told Zapata that his girlfriend could not be his hooding professor at the fall ceremony.  *Id.*  He also informed Zapata "that he should not propose to his girlfriend" at the ceremony "if he wanted to participate in the commencement ceremony."  *Id.* ¶ 121.

Finally, Zapata complains that he did not receive a master's degree in addition to his doctoral degree.  He alleges that the requirements for the PhD and the non-thesis master's degree overlap and that several PhD students were able "to obtain an MS non-thesis degree without the need for enrollment in an MS program" by "us[ing] their PhD qualifying exam

– 6 –

as a replacement for the MS program's 'comprehensive exam.'"  *Id.* ¶¶ 140–42.  Zapata claims that he contacted various administrators in August 2022 about this master's degree and asked that they grant him a non-thesis master's like those other PhD students had received.  *Id.* ¶ 144.  In September 2022, Zapata was told "that he would not be granted an MS degree because 'a degree cannot be conferred retroactively,'" and he did not request the degree during his PhD studies.  *Id.* ¶¶ 145–46.  Zapata alleges that he had no way to know that he could have requested the degree during his studies and that the Chemical Engineering Department only informed Asian students of this opportunity, leaving him and "most PhD students" in the department unable to obtain this degree.  *Id.* ¶ 146.

### B.   Procedural History

Based on these events, Zapata filed a complaint naming Texas Tech and numerous professors and administrators as defendants.  Dkt. No. 1.  The defendants then moved to dismiss his complaint, Dkt. No. 8, and Zapata filed an amended complaint, Dkt. No. 11.  The amended complaint names as defendants: (1) Texas Tech; (2) Simon, his dissertation chair; (3) Sacco, the Dean of the College of Engineering at the time; (4) Sheridan, the Dean of the Graduate School; (5) Weeks, the Dean of the Research and Graduate Programs; (6) Botte, the Chair of the Chemical Engineering Department; (7) Dr. Chau-Chyun Chen, a member of the Chemical Engineering Graduate Committee that allegedly outlined the specific requirements for a publication to satisfy the two-publication requirement; (8) Dr. Siva Vanapalli, also a member of the Chemical Engineering Graduate Committee; (9) Dr. Wei Li, a member of the Chemical Engineering Graduate Committee and of Zapata's dissertation committee; and (10) Dr. Harvinder Singh Gill, a member of the Chemical Engineering Graduate Committee.  Dkt. No. 11 ¶¶ 9–18, 106–07.  Zapata asserts four

claims in his amended complaint: (1) discrimination and retaliation under Title VI; (2) a violation of the Equal Protection Clause under Section 1983; (3) a violation of the Due Process Clause under Section 1983; and (4) racial discrimination and retaliation under Section 1981. *Id.* ¶¶ 150–76.

Following the amended complaint, the defendants again moved to dismiss Zapata's claims. Dkt. No. 16. Zapata filed a response, Dkt. No. 22, and the defendants have replied, Dkt. No. 27. The motions to dismiss (Dkt. Nos. 8; 16) are now ripe for the Court's review. In light of the intervening amended complaint and superseding motion to dismiss, the Court denies as moot the first motion to dismiss (Dkt. No. 8) and will instead address the merits of the amended motion and the sufficiency of the amended complaint.

## 2.    Legal Standards

### A.    Motion to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Therefore, a plaintiff must allege sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A plaintiff's claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* If a complaint "pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Defendants can challenge the sufficiency of a complaint through a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  In resolving a motion to dismiss, a court must "accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff."  *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015) (cleaned up) (quoting *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010)).  However, this tenet does not extend to legal conclusions.  *Iqbal*, 556 U.S. at 678.  Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

### B.    Qualified Immunity

When government officials—like professors and university administrators—perform discretionary functions, they are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Kinney v. Weaver*, 367 F.3d 337, 349 (5th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see Babinski v. Sosnowsky*, 79 F.4th 515, 517 (5th Cir. 2023).  Accordingly, officials are protected by qualified immunity unless their actions violate a right that is "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Kinney*, 367 F.3d at 349–50 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  A right may be clearly established even in the absence of a case with "materially similar" facts "so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."  *Id.* at 350 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).  The key is whether an official had "fair warning" that his conduct was unlawful.  *Id.* (quoting *Hope*, 536 U.S. at 740).

Qualified immunity has two prongs: (1) whether the plaintiff has asserted a violation of a constitutional right; and (2) whether that right was clearly established at the time. *Id.* A court may resolve the qualified immunity question at either step, so if a right was not clearly established, a court need not determine whether there was a constitutional violation. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor." *Id.* (citation omitted). Consequently, to survive a motion to dismiss when the defendants properly raise qualified immunity, the complaint must "assert facts which, if true, would overcome the defense of qualified immunity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012) (quoting *Wicks v. Miss. State Emp. Servs.*, 41 F.3d 991, 994 (5th Cir. 1995)). As a result, "a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Id.* Ultimately, "'qualified immunity represents the norm,' and courts should deny a defendant immunity only in rare circumstances." *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020) (quoting *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018)).

A plaintiff may show that a right was clearly established in two ways. *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). He can show a case or body of relevant law where an official was held to have violated the Constitution under similar circumstances. *Id.* Under this approach, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). So a plaintiff "must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of

particularity." *Smith v. Davis*, 507 F. App'x 359, 361 (5th Cir. 2013) (quoting *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011)).  Alternatively, in rare circumstances, "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Batyukova*, 994 F.3d at 726 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)); *Taylor v. Riojas*, 592 U.S. 7, 9 (2020) ("Confronted with the particularly egregious facts of this case, any reasonable officer should have realized that [the plaintiff's] conditions of confinement offended the Constitution.").

**3.  Analysis**

The Court grants the defendants' amended motion to dismiss.  Dkt. No. 16.  Each of Zapata's claims has a fatal flaw because he has either failed to state a plausible claim for relief or failed to plead sufficient facts to overcome the individual defendants' entitlement to qualified immunity.

**A.     Zapata's Title VI Claims**

Zapata first asserts discrimination and retaliation claims based on Title VI of the Civil Rights Act of 1964.  Dkt. No. 11 ¶¶ 150–55.  The defendants argue that the discrimination claim should be dismissed because he has not plausibly alleged intentional discrimination or that an appropriate official knew of any discrimination.  Dkt. No. 19 at 38–39.  They contend that the retaliation claim fails because Zapata did not allege that any adverse action occurred after he engaged in any protected activity or that the relevant individuals knew of his protected activity.  *Id.* at 40–42.  The Court grants the motion to dismiss these claims.

**i.     Discrimination Claim**

Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation

in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.  To state a Title VI claim, a plaintiff must allege that the defendant (1) received federal financial assistance and (2) discriminated on the basis of race or national origin.  *See Russell v. City of Tupelo*, 544 F. Supp. 3d 741, 762 (N.D. Miss. 2021); *see also Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 706 n.9 (5th Cir. 1994).  Importantly, Title VI "prohibits only intentional discrimination," so a plaintiff must allege discriminatory intent to state a claim; disparate impact is insufficient.  *See Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015) (emphasis omitted) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)).  If the complaint "does not set forth 'specific allegations of acts that were taken with discriminatory intent,'" it "does not state a claim for Title VI violations." *Mohamed ex rel. A.M. v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602, 627 (N.D. Tex. 2017) (quoting *Muthukumar v. Univ. of Tex. at Dall.*, No. 3:10-CV-115-B, 2010 WL 5287530, at *5 (N.D. Tex. Dec. 27, 2010)).

Only entities, not individuals, can be liable for a violation of Title VI, so the only relevant defendant for Zapata's Title VI claim is Texas Tech, which he has alleged receives federal funding.  *See Price ex rel. Price v. La. Dep't of Educ.*, 329 F. App'x 559, 561 (5th Cir. 2009); Dkt. No. 11 ¶ 151.  A plaintiff then must allege either an official discriminatory policy or that "an 'appropriate person'—an official authorized to institute corrective measures—had 'actual knowledge' of the discrimination and responded with 'deliberate indifference.'"  *Mohamed ex rel. A.M.*, 252 F. Supp. 3d at 627 & n.14 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)); *see also* 42 U.S.C. § 2000d-1.  An entity is only responsible for "its own official decision," not "its employees' independent actions."

*Gebser*, 524 U.S. at 291.[2]  Accordingly, an institution cannot be liable under Title VI based merely on negligence, constructive notice, or vicarious liability.  *See id.* at 285, 288; *Mohamed ex rel. A.M.*, 252 F. Supp. 3d at 627 & n.14.  Deliberate indifference is satisfied only where the official's response is "clearly unreasonable in light of the known circumstances."  *Fennell*, 804 F.3d at 410 (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,526 U.S. 629, 648 (1999)).  "Ineffective responses are not necessarily clearly unreasonable," so an official's actions might not be deliberately indifferent "even if the harm ultimately was not averted."  *Id.* at 410–11 (cleaned up) (first quoting *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 168 (5th Cir. 2011); and then quoting *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000)).  Moreover, failing to follow the institution's policies does not establish deliberate indifference.  *Sanches*, 647 F.3d at 169.

In the case of academic decisions, "courts accord great deference to a school's determination."  *Bisong v. Univ. of Hous.*, 493 F. Supp. 2d 896, 905 (S.D. Tex. 2007).  Such "[a]cademic evaluations of a student" are "subjective and evaluative" and "not readily adapted to the procedural tools of judicial or administrative decisionmaking."  *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 89–90 (1978).

Zapata does not allege an official discriminatory policy by Texas Tech, so he must allege that there was intentional discrimination based on his race or national origin that an

---

[2] While *Gebser* specifically addressed Title IX rather than Title VI, the Supreme Court noted that the two statutes are "parallel . . . except that [Title VI] prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only education programs." 524 U.S. at 286.  Importantly, both statutes "operate in the same manner," so "case law interpreting Title IX is equally applicable to cases involving Title IV."  *Mohamed ex rel. A.M.*, 252 F. Supp. 3d at 627 n.14 (quoting *Gebser*, 524 U.S. at 286).

appropriate official knew about and responded with deliberate indifference. *See Mohamed ex rel. A.M.*, 252 F. Supp. 3d at 627.  Zapata's amended complaint lists several examples of alleged discrimination and/or retaliation: (1) Simon yelling at him for speaking Spanish; (2) Simon's repeated demands for corrections to his dissertation; (3) the two-semester delay in his graduation; (4) enforcement of the two-publication requirement; and (5) not awarding him a master's degree after he graduated. *See* Dkt. Nos. 11 ¶ 153; 22 at 23–24, 26.

The Court grants the motion to dismiss because Zapata has not plausibly alleged that these actions were intentional discrimination based on his race or national origin or that an appropriate official acted with deliberate indifference.  Zapata does not provide any examples of Texas Tech awarding any student a master's degree after that student had already matriculated from the university, so he has failed to plausibly allege that it denied him a master's degree based on his race or national origin. *See id.* ¶¶ 138–47.  Regarding the two-publication requirement, his allegations indicate that Weeks and Sacco were unaware that some of the department's professors had been allowing students to defend their dissertations prior to completing two publications. *See id.* ¶¶ 60, 111–12.  And, moreover, Simon permitted Zapata to defend his dissertation prior to satisfying the requirement, just as she did with the other students. *See id.* ¶¶ 26, 52, 60, 86.  In addition, Zapata does not assert any instances of harassment based on him speaking Spanish after his complaints about Simon or that any appropriate official had actual knowledge of it, such that no official could have possibly been deliberately indifferent to this alleged harassment.

As for the other conduct, while Zapata asserts that he told numerous individuals about his grievances, *id.* ¶ 129, his claim that they simply "dismissed his concerns" is belied by his other specific factual allegations, *see id.* ¶¶ 57, 59–60, 79, 84, 105–09, 118–19, 129.

While university officials may not have given Zapata everything he wanted, they responded to and repeatedly met with him about his complaints and discussed methods to facilitate solutions.  *E.g., id.* ¶¶ 57, 79, 84, 105–06, 109–18.  When Simon was delaying her approval of his dissertation, the Graduate School added Weeks as Zapata's dissertation approver, causing Simon to restart communications with Zapata about deficiencies in his dissertation. *Id.* ¶¶ 57, 59.  They reached out to committees to obtain answers to his questions about the two-publication requirement and ultimately provided him with a special disposition so that he could graduate in Fall 2021, thereby ending any delay in his graduation.  *Id.* ¶¶ 106, 118–19.  In other words, these officials' efforts ultimately brought about the result Zapata wanted—obtaining his doctoral degree.  Accordingly, the Court concludes that Zapata has failed to plausibly allege deliberate indifference.

### ii.  Retaliation Claim

As for his retaliation claim, Zapata "must show (1) that [he] engaged in a protected activity; (2) that the [d]efendants took a material action against [him;] and (3) that a causal connection existed between the protected activity and the adverse action."  *Jones v. S. Univ.*, 834 F. App'x 919, 923 & n.3 (5th Cir. 2020).  Moreover, in the Title VI context, "the funding recipient itself" must have "signed off on the adverse action."  *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 586 (5th Cir. 2020).  As a result, even in the retaliation context, a plaintiff must show that the entity either had an official policy of retaliation or was deliberately indifferent to retaliation.  *Id.* at 586–87.  The Court dismisses this claim because Zapata has not alleged any adverse action by Texas Tech that occurred after any defendant learned that he engaged in protected activity.

Protected activities include opposing unlawful discrimination or making a Title VI charge. *See Davis v. Dall. Indep. Sch. Dist.*, 448 F. App'x 485, 492 (5th Cir. 2011); *Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 252 n.18 (5th Cir. 1997). But "a vague complaint, without any reference to [unlawful discrimination under Title VI], does not constitute protected activity." *Davis*, 448 F. App'x at 493. Accordingly, "[c]omplaining about unfair treatment without specifying why the treatment is unfair . . . is not a protected activity." *Tratree v. BP N. Am. Pipelines, Inc.*, 277 F. App'x 390, 395 (5th Cir. 2008). The plaintiff must have referred to the discriminatory treatment as based on his race or national origin. *See id.* at 396.

Here, while Zapata repeatedly claims that some Asian students graduated without complying with the two-publication requirement and that he complained that he was being treated unfairly by Simon and others, he does not indicate that he complained to these administrators that this requirement was intentionally being applied to him based on his race or national origin. *See* Dkt. No. 11 ¶ 60. Instead, the first time that Zapata alleges that he told anyone that he complained about discriminatory treatment related to his national origin was on October 20, 2021, after he filed his grievance.[3] *Id.* ¶¶ 87–88. Accordingly, any actionable retaliation had to occur after October 20, 2021.

Zapata has not alleged that any adverse action occurred after October 20, 2021, in retaliation for any complaint. Adverse actions include those that "might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." *Davis*, 448 F.

---

[3] Zapata's amended complaint does not make clear that this grievance stated that any discrimination was based on his national origin. However, the Court will generously construe his claim that the grievance noted "intentional and discriminatory tactics on . . . his international status" as raising discrimination based on his national origin. *See* Dkt. No. 11 ¶ 88.

App'x at 494 (quoting *Burlington N. & Sante Fe Ry. v. White*, 548 U.S. 53, 68 (2006)).  And any adverse action must be caused by the protected activity, so any adverse action that occurred before the protected activity cannot constitute retaliation.  *Id.*  And an individual who did not know of the protected activity cannot retaliate.  *Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir. 1999).  Zapata does not allege any instance of Simon requiring new corrections after his grievance.  Instead, Simon provided her final approval of his dissertation on November 12, 2021.  Dkt. No. 11 ¶ 93.  And, while Sheridan initially continued to tell Zapata that he needed to have another paper published under the two-publication requirement, Weeks told Zapata to request a special disposition so he could graduate without the publication being accepted.  *Id.* ¶¶ 114, 117.  The disposition was granted, and Zapata was permitted to graduate that fall.  *Id.* ¶¶ 117–19.  Moreover, given that the administrators sought to apply the two-publication requirement prior to any knowledge of his grievance, it is unclear how continuing to maintain that preexisting requirement could plausibly be caused by his complaint.  *See Davis*, 448 F. App'x at 493–94.

At most, Zapata alleges that Sheridan denied his request to have his girlfriend as his hooding professor and told him not propose to his girlfriend at the hooding ceremony after the grievance.  Dkt. No. 11 ¶¶ 120–21.  Even if this constituted a retaliatory adverse action, this allegation constitutes only a claim that Sheridan retaliated against him—not Texas Tech itself.  And Zapata does not allege that he complained to any appropriate official about Sheridan's decision to not let his girlfriend be his hooding professor or telling him not to propose at the ceremony.  *See generally id.*  These allegations are insufficient to show either an official retaliatory policy or deliberate indifference to retaliation, and therefore, Zapata has not alleged a Title VI retaliation claim.  *See Sewell*, 974 F.3d at 586–87.

**B.     Zapata's Equal Protection Claim**

Through 42 U.S.C. § 1983, Zapata asserts that the individual defendants—Simon, Sacco, Sheridan, Weeks, Botte, Chen, Vanapalli, Li, and Gill—violated his rights under the Fourteenth Amendment's Equal Protection Clause.  Dkt. No. 11 ¶¶ 156–63.  He bases this violation on (1) harassment for him speaking Spanish; (2) the enforcement of the two-publication requirement; (3) the additional corrections required to receive approval of his dissertation; and (4) the denial of a master's degree.  *See id.* ¶ 159; Dkt. No. 22 at 19–21.

The Court dismisses these claims because Zapata's claimed examples of discrimination fail to plausibly allege unequal treatment or a violation of a clearly established right.  To avoid dismissal, Zapata must overcome the individual defendants' ordinary qualified immunity by alleging a violation of a clearly established right.  *Kinney*, 367 F.3d at 349–50.  Zapata does not provide any legal authority to show that a clearly established right was violated.  *See* Dkt. No. 22 at 19–21.  He does not attempt to explain how his allegations satisfy the elements of an equal-protection claim or even what he believes the proper standard is for this claim despite seeming to contest the defendants' framing.  *Id.*  Instead, he argues only that the defendants misconstrue his factual allegations.  *Id.*  In essence, he seeks, in the qualified-immunity context, for the Court to formulate his claim for him and to find that the defendants violated clearly established law—despite his own failure to point to any similar cases or any authority whatsoever.  Given the uniqueness of Zapata's claims, where he was not actually deprived of his education, expelled, suspended, or experienced any similar material action, he has clearly failed to carry his

burden to overcome qualified immunity.[4]  Even if the Court were to fashion what it understands to be Zapata's claims, he has not alleged a violation of any clearly established right.  Moreover, many of his allegations fail to plausibly allege that he received unequal treatment in the first place, so he has not asserted a violation of a constitutional right, much less a clearly established one.

The Fourteenth Amendment's Equal Protection Clause prohibits discrimination "based upon an unjustifiable standard such as race, religion, or other arbitrary classification."  *United States v. Batchelder*, 442 U.S. 114, 125 n.9 (1979) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)).  "To state a claim of racial discrimination under the Equal Protection Clause and [S]ection 1983, the plaintiff 'must allege and prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.'"  *Priester v. Lowndes County*, 354 F.3d 414, 424 (5th Cir. 2004) (quoting *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001)).  This discriminatory intent "implies that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group."  *Id.* (quoting *Taylor*, 257 F.3d at 473).

---

[4] As a general matter, Zapata appears to believe that the mere existence of the Equal Protection Clause clearly establishes a violation here.  *See generally* Dkt. No. 22 at 15–21.  This reflects a fundamental misunderstanding of how qualified immunity operates.  The Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality."  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (cleaned up) (quoting *al-Kidd*, 563 U.S. at 742).  When qualified immunity is raised, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established'" and must be resolved "in light of the specific context of the case, not as a broad general proposition."  *Id.* (emphasis in original) (first quoting *al-Kidd*, 563 U.S. at 742; and then quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).  This requirement applies even to axiomatic constitutional provisions such as the First Amendment's prohibition on viewpoint-based discrimination.  *See Morgan*, 659 F.3d at 378–79.  Accordingly, while the Equal Protection Clause indisputably prohibits discrimination by government actors based on an individual's race or national origin, that "rule is far too general to clearly establish the law in this case."  *See id.*

Alternatively, a plaintiff can proceed under a class-of-one theory by alleging "that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the different in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "A plaintiff's subjective belief of discrimination, however genuine, cannot be the basis of judicial relief." *Stout v. Vincent*, 717 F. App'x 468, 472 (5th Cir. 2018) (cleaned up) (quoting *Elliott v. Grp. Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983)). And one official's discriminatory intent is not imputed to another official, so a plaintiff must allege that each individual defendant acted with a discriminatory purpose. *Id.*

The discriminatory intent requirement under the Equal Protection Clause is the same as that required for a Title VI claim. *See Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 639 (5th Cir. 2021). In analyzing whether a plaintiff has pled discriminatory intent, a court first looks to "whether the challenged action 'bears more heavily on one race than another.'" *Id.* (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). When "the disparate impact is clearly 'unexplainable on grounds other than race,' . . . a court may infer racial animus." *Id.* (quoting *Arlington Heights*, 429 U.S. at 266). Otherwise, a "court must perform 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Id.* (quoting *Arlington Heights*, 429 U.S. at 266). Regardless, "an equal protection plaintiff 'must allege and prove that he received treatment different from that received by similarly situated individuals.'" *Id.* at 640 n.4 (quoting *Crain v. City of Selma*, 952 F.3d 634, 642 (5th Cir. 2020)). Individuals are similarly situated when "they 'are in all relevant respects alike.'" *Tex. Ent. Ass'n v. Hegar*, 10 F.4th 495, 513 (5th Cir. 2021) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

###### i.    Harassment

Zapata's first ground for his equal protection claim is harassment by Simon based on his race and national origin by telling him not to speak Spanish.  *See* Dkt. No. 11 ¶¶ 31, 159.  Harassment based on a protected category must be objectively offensive in order to state a claim under the Equal Protection Clause.  *See Lauderdale v. Tex. Dep't of Crim. Just.*, 512 F.3d 157, 166 (5th Cir. 2007).  To be objectively offensive, the harassment must be sufficiently severe or pervasive such that a reasonable person would find that it created a hostile or abusive environment.  *See id.* at 163, 166.  Courts consider the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the individual's performance.  *Id.*

Here, Zapata cites discrimination based on Simon creating an "English only rule."  Dkt. No. 11 ¶ 31.  It is not clearly established that such conduct is objectively offensive harassment based on his race or national origin.  Zapata's response provides no legal authority to support this claim.  In fact, Zapata fails to cite a single case in the portion of his response addressing his equal-protection claims.  *See* Dkt. No. 22 at 19–21.  In addition, the Fifth Circuit has noted that the language one speaks is not automatically equated to national origin or race.  *Garcia v. Gloor*, 618 F.2d 264, 268 (5th Cir. 1980).  It further held, in the employment context, that forbidding a bilingual person from "speak[ing] anything but English . . . while on the job is not discrimination based on national origin as applied to a person who is fully capable of speaking English."  *Id.* at 272.  Since at least some English-only rules are permissible, Zapata has not shown that it is "sufficiently clear that every reasonable [professor] would have understood" that requiring him to speak English violated his rights.  *See Mullenix*, 577 U.S. at 11 (quoting *Reichle v. Howards*, 566 U.S. 658, 664

(2012)).  And, in any event, while Zapata makes a conclusory claim that he was treated differently than the Asian students regarding this rule, he does not actually allege that any of the Asian advisees spoke something other than English around Simon or that she did not enforce this rule as to them.  *See* Dkt. No. 11 ¶ 31.  Zapata does not claim that Simon punished him because he spoke Spanish or that this English-only rule negatively impacted his ability to perform in his program.  *See id.*  Under these circumstances, Zapata has not shown that it was clearly established that requiring him to speak English violated his equal protection rights, and Simon is entitled to qualified immunity as to this claim.

### ii.    The Two-Publication Requirement

Next, Zapata contends that the imposition of the two-publication requirement violated the Equal Protection Clause.  *Id.* ¶ 159.  There are two aspects to this claim: (1) the administrators (Sacco, Sheridan, Weeks, and Botte) telling Zapata that he needed two publications to graduate; and (2) the committee members (Chen, Li, Vanapalli, and Gill) stating that the two-publication requirement could only be fulfilled by a publication written with his dissertation advisor and for which the student was the first author.  *See, e.g.*, *id.* ¶¶ 60, 101, 103, 105–07, 111–12, 117–18.  As a preliminary matter, Zapata does not provide more than conclusory statements to indicate any intentional discrimination on the part of these defendants.  Zapata repeatedly notes that several Asian students defended their dissertations and graduated without complying with the requirement, but based on his allegations, the two-publication requirement was communicated to him by Weeks after Zapata sought out a new dissertation approver.  *See id.* ¶¶ 57, 60.  While Zapata told Weeks that other students had previously graduated without complying with the requirement, he does not allege that Weeks knew of that noncompliance before he chose to enforce it against

Zapata.  *Id.* ¶ 60.  And although he claims that Simon and Botte knew that the other students lacked two publications at their graduation, it was Sacco who ultimately appeared to be the one enforcing the requirement.  *Id.* ¶¶ 101, 117–18.  And based on Sacco's statements as alleged by Zapata, Sacco indicated that he had been unaware about the past students who had graduated without the two publications.  *See id.* ¶¶ 111–12.  Accordingly, Zapata has not alleged that any similarly situated student was knowingly permitted to graduate when the relevant administrators knew that the two-publication requirement had not been fulfilled.  Without a viable comparator, he has not plausibly alleged the violation of a clearly established right.  *See Rollerson*, 6 F.4th at 640 n.4.

Moreover, even if these other Asian students could be considered similarly situated, Zapata's factual allegations do not support the notion that he received different treatment than they did.  Regarding his complaints about the formulation of what counted as a publication and the past insistence that he must have two in order to graduate, Zapata himself was never required to actually comply with the requirement.  *See id.* ¶¶ 106–07, 116–18.  Zapata admits that for his second publication, he was listed as the third—not the first—author.  *See id.* ¶ 116.  Nevertheless, he, like the other students, was permitted to graduate without fulfilling the requirement of two first-author publications.  He also, like the other students, defended his dissertation prior to completing the requirement.  *See id.* ¶¶ 52, 60, 102.  Zapata provides no authority for the proposition that communicating a policy to him, especially where the policy was ultimately waived, is a clearly established violation of the Equal Protection Clause.  *See* Dkt. No. 22 at 19–21.  He ultimately received the same treatment as the Asian students regarding the two-publication requirement.  He therefore

has not alleged that any clearly established right was violated regarding the two-publication requirement, and the defendants are therefore covered by qualified immunity.

### iii.    Requiring Additional Corrections

Zapata also lacks a similarly situated individual for his claim that he was discriminated against when Simon required him to make additional corrections to his dissertation.  Zapata complains that Simon required him to go through an iterative correction process where she would send additional corrections after previously indicating that an earlier list was final or that a portion was acceptable.  *See, e.g.*, Dkt. No. 11 ¶¶ 85, 89–91.  Zapata's distinction between Simon's corrections to him and her treatment of her Asian advisees is based on what he characterizes as "procedural anomalies."  Dkt. No. 22 at 20.  But Zapata provides no factual allegations to show how he and these other students are alike in all relevant respects.  Instead, he merely notes that they were all Texas Tech students advised by Simon.  *See id.*; *see also* Dkt. No. 11 ¶ 62.  But he does not claim that they also had deficiencies with their dissertations that Simon overlooked rather than requiring corrections, or that she did not tell them that a list of corrections was final only to later find others.  He does not assert that Simon had another student whose dissertation "d[id] NOT meet [her] approval yet" but did not require additional corrections.  *See* Dkt. No. 11 ¶ 53 (emphasis in original).  While he alleges that no Asian student had to submit numerous corrections after having their dissertation approved, Zapata himself acknowledges that Simon informed him that she did not approve of his dissertation until November 2021, after which point he did not have to submit other corrections.  *See id.* ¶¶ 53, 62, 93.

As for the other defendants whom he claims violated his rights by permitting Simon to require more corrections, he does not allege that they ever stopped the iterative correction

process for any other student whose dissertation chair withheld approval.  *See generally id.*
Nor does he point to a single student whom they let graduate or approved of their
dissertation prior to final approval by their dissertation advisor.  *See generally id.*
Accordingly, he lacks any similarly situated person for this claim and has failed to allege a
violation of his clearly established rights.  *See Rollerson*, 6 F.4th at 640 n.4.  The defendants
therefore retain qualified immunity as to this claim.

### iv.     Denial of a Master's Degree

Zapata's claim regarding the refusal to provide him a master's degree fares no better.
Zapata acknowledges that he was told he could not receive a master's degree because he had
already matriculated.  Dkt. No. 11 ¶ 145.  He does not point to any student, Asian or
otherwise, who requested a master's degree after graduating from Texas Tech and received
one.  *See id.* ¶¶ 138–46.  He also does not allege that any student, like himself, who did not
apply for a master's degree ever received one.  *Id.*  Without a similarly situated individual,
Zapata has failed to allege a clearly established equal-protection violation, and the
defendants retain qualified immunity as to this claim.  *See Rollerson*, 6 F.4th at 640 n.4.

### v.     Retaliation

Finally, to the extent that Zapata argues that the defendants violated the Equal
Protection Clause by retaliating against him for his complaints, *see* Dkt. No. 11 ¶ 160, this
claim is also dismissed.  There is no clearly established right to be free of retaliation under
the Equal Protection Clause.  *Cox v. Scott Cnty. Sch. Dist.*, No. 3:18-CV-677-KHJ-LGI, 2021
WL 1207718, at *13 (S.D. Miss. Mar. 30, 2021); *Jackson v. Mississippi*, No. 5:12cv94-DPJ-
FKB, 2012 WL 5185726, at *2 (S.D. Miss. Oct. 18, 2012) (collecting cases).  Accordingly,
the individual defendants retain qualified immunity as to any such claim.

### C.    Zapata's Due Process Claim

Zapata next claims that the individual defendants violated his due process rights under the Fourteenth Amendment by arbitrarily applying the two-publication requirement and insisting on additional corrections to his dissertation.  Dkt. No. 11 ¶ 165.  The Court dismisses this claim because Zapata has not alleged that the defendants violated a clearly established right, and they are therefore shielded by qualified immunity.

To state a claim under the Fourteenth Amendment's Due Process Clause, a plaintiff must allege deprivation of a liberty or property interest.  *Smith*, 507 F. App'x at 362.  These rights are created "by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  Texas has recognized a liberty interest in graduate higher education.  *Plummer v. Univ. of Hous.*, 860 F.3d 767, 773 (5th Cir. 2017) (citing *Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929–30 (Tex. 1995)).  However, Zapata does not allege that he was denied graduate education.  Instead, he successfully completed his doctoral program at Texas Tech.  Dkt. No. 11 ¶ 119.  The Fifth Circuit "has held a student who is not denied access to public education does not have a property or liberty interest implicated" and has "rejected arguments that there is any protected interest in the separate components of the educational process."  *Smith*, 507 F. App'x at 362 (emphasis omitted) (quoting *Nevares v. San Marcos Consol. Indep. Sch. Dist.*, 111 F.3d 25, 27 (5th Cir. 1997)).  Accordingly, when a plaintiff does not allege denial of access to education and the matters at issue are ultimately academic, the Fifth Circuit has granted qualified immunity to university officials.  *Id.* at 362–63.

Zapata provides no support to the contrary to show that he was deprived a clearly established property or liberty interest.  *See* Dkt. No. 22 at 15–19.  Instead he cites two out-of-circuit district court cases, both of which involved termination or expulsion—in other words, an actual deprival of the educational experience.  *See id.* at 19; *Thomas v. Gee*, 850 F. Supp. 665, 676 (S.D. Ohio 1994); *Rigdon v. Ga. Bd. of Regents*, 594 F Supp. 2d 1312, 1314 (S.D. Ga. 2008).  Thus, not only has Zapata failed to "point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity," *Smith*, 507 F. App'x at 361 (quotation omitted), in order to show that the imposition of the two-publication requirement or requiring him to make additional corrections deprived him of a protected interest, but the cases he cites involve materially different circumstances than those here.  Moreover, as for Zapata's argument that he has a liberty interest in being free of racial discrimination, *see* Dkt. No. 22 at 19, courts in this circuit have rejected such an attempt to recast an equal-protection claim as a substantive due process one.  *See Mercado Azteca, L.L.C. v. City of Dallas*, No. Civ.A.3:03-CV-1145-B, 2004 WL 2058791, at *7 n.8 (N.D. Tex. Sept. 14, 2004).  Under these circumstances, the Court concludes that Zapata has not alleged the violation of a clearly established right.  Zapata therefore has not carried his burden to overcome the defendants' qualified immunity as to his due process claim.

### D.    Zapata's Section 1981 Claim

Finally, Zapata asserts a claim of racial discrimination and retaliation pursuant to 42 U.S.C. § 1981 against the individual defendants.  Dkt. No. 11 ¶¶ 170–76.  Specifically, he alleges that the Chemical Engineering Department's handbook and other written policies of Texas Tech "created a contractual relationship between Texas Tech and [Zapata]" and that

the defendants treated him differently under these policies based on his race. *Id.* ¶ 174. The Court dismisses this claim because the only possible contractual right alleged was not discriminatorily applied.

Section 1981 "bars race discrimination in contracting." *Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918, 931 (5th Cir. 2021) (emphasis omitted). To state a Section 1981 claim, a plaintiff must allege that "(1) he is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in [42 U.S.C. § 1981], such as the making and enforcing of a contract." *Id.* A plaintiff "must initially identify an impaired 'contractual relationship,' under which [he] has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (citation omitted). Accordingly, a plaintiff fails to state a claim when he does not "identify the content of the contract at issue" or "the particular contractual rights that the [defendants] prevented [him] from exercising." *Grambling Univ. Nat'l Alumni Ass'n v. Bd. of Supervisors for La. Sys.*, 286 F. App'x 864, 870 (5th Cir. 2008).

Zapata has failed to properly identify any contractual right that the defendants allegedly discriminated against him in enforcing, performing, or otherwise. His amended complaint alleges that the Chemical Engineering "Department's handbook and other written policies of Texas Tech and its agencies created a contractual relationship between Texas Tech and [Zapata]." Dkt. No. 11 ¶ 174. But the only possibly identified contractual right is that some unknown individual "expressly told" Zapata that "the handbook contained the requirements he would be expected to satisfy to obtain his graduate degree." *Id.* Neither Zapata's amended complaint nor his briefing on the pending motion clearly

explain how these requirements were altered, discriminately enforced, or performed.[5]  *See id.* ¶¶ 170–76; Dkt. No. 22 at 22–23.

Nevertheless, Zapata does claim that the two-publication requirement did not appear in the department's handbook, Dkt. No. 11 ¶ 95, and, generously construed, this could implicate his alleged contractual right that he only needed to comply with the handbook's requirements to graduate.  But even if the Court so construes Zapata's claim, as previously explained, he has failed to allege any discrimination based on the two-publication requirement.  Zapata ultimately was not required to comply with the two-publication requirement prior to his dissertation defense or graduation and therefore was treated no different from the other students.  *See id.* ¶¶ 106–07, 116.  So, even if his allegations are sufficient to identify any contractual right, he has failed to plausibly allege any discrimination in connection to it.[6]  Accordingly, his Section 1981 claim is dismissed as well.

---

[5] Zapata's amended complaint lists various discriminatory actions but does not identify any contractual right in the handbook or other unidentified policies that these actions implicated.  Dkt. No. 11 ¶ 173–74.  His briefing does not identify any contractual right.  *See* Dkt. No. 22 at 22–23.

[6] In addition, the individual defendants are not parties to any alleged contract at issue.  *See* Dkt. No. 11 ¶ 174.  Typically, a non-party to a contract may only be liable under Section 1981 if he is "essentially the same" as the contracting party.  *Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 337 (5th Cir. 2003) (quotation omitted); *Perry*, 990 F.3d at 932–33.  To satisfy this "essentially the same" requirement, "the plaintiff must adequately plead that the defendant had the capacity to bring about the conduct that forms the basis of the plaintiff's complaint"—in other words, that the defendant had the authority to influence the action that was the contractual breach.  *Miller v. Wachovia Bank, N.A.*, 541 F. Supp. 2d 858, 866 (N.D. Tex. 2008).  Zapata does not specifically allege which of these defendants, if any, had the authority to alter "the requirements he would be expected to satisfy to obtain his graduate degree," except perhaps for Sacco, who granted the special disposition that waived the two-publication requirement and therefore did not treat him any different from the other students.  *See* Dkt. No. 11 ¶¶ 117–18, 174.

4.      **Conclusion**

Zapata's amended complaint does not plausibly allege that he is entitled to relief.

His Title VI claims lack discriminatory intent, deliberate indifference, or retaliatory action.

The individual defendants are shielded by qualified immunity regarding his Equal

Protection and Due Process claims, and he has not plausibly alleged discrimination in the

enforcement or performance of a contractual right for his Section 1981 claim.  Accordingly,

the Court denies as moot the defendants' original motion to dismiss (Dkt. No. 8), grants the

defendants' amended motion to dismiss (Dkt. No. 16), and dismisses Zapata's claims with

prejudice.  Moreover, the Court declines to grant leave to amend here because Zapata does

not request leave to amend, and there is no indication that he has not already pled his best

case.  *See Wiggins v. La. State Univ.—Health Care Servs. Div.*, 710 F. App'x 625, 627–28 (5th

Cir. 2017).

The Court will enter final judgment in accordance with Federal Rule of Civil

Procedure 58 in a separate document.

So ordered on March 11, 2024.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE